**CALLER–TIMES PUBLISHING COMPANY, INC.,**
Petitioner,

v.

**TRIAD COMMUNICATIONS, INC.,**
**d/b/a Wheels & Keels,**
Respondent.

No. C–9979.

Supreme Court of Texas.

Feb. 26, 1992.

Dissenting Opinion Nov. 13, 1991.

Dissent on Motion for Rehearing Feb. 26, 1992.

---

Jorge C. Rangel, Corpus Christi, Mike Hatchell, Tyler, for petitioner.

Arnold Anderson Vickery, E. Landers Vickery, Houston, for respondent.

## OPINION ON MOTION FOR REHEARING

COOK, Justice.

Our opinion and judgment of November 13, 1991 are withdrawn. The motion for rehearing is granted in part and overruled in part. We grant the portion of the motion for rehearing requesting a remand to the trial court for a new trial on the antitrust claims.

This case presents a question of first impression requiring us to determine what constitutes predatory pricing for purposes of the Texas Free Enterprise and Antitrust Act of 1983. Tex.Bus. & Com.Code §§ 15.-01-15.51 (the "Texas Antitrust Act"). We hold that based on the record in the case,

the Caller–Times did not engage in predatory pricing. Therefore, we reverse the portion of the court of appeals' judgment holding that the Caller–Times violated the Texas Antitrust Act,[1] 791 S.W.2d 163, and remand to the court of appeals for consideration of the Caller–Times' points of error on Triad's alternative ground of recovery. Following consideration in the court of appeals, the court of appeals shall, if requested by Triad, remand to the trial court for a new trial on Triad's antitrust claims.

I.

The Caller–Times Publishing Company's market area is Corpus Christi and the surrounding eleven counties. The company publishes two daily newspapers (The Corpus Christi Caller and The Corpus Christi Times), an advertising circular called the "Pennysaver," and other supplemental publications. The Caller–Times has a combined circulation rate of 82,000 for its daily newspapers.

In mid–1984, Triad Communications, Inc. purchased an advertising circular called "Wheels and Keels" for $10,000.00. Wheels and Keels was a circular which featured display and classified advertising primarily for automobiles and boats. Its market area was Corpus Christi and the surrounding cities, which placed it in direct competition with the Caller–Times over most of the Caller–Times' market area.

In 1986, Triad filed suit in state court against the Caller–Times under the Texas Antitrust Act. Triad alleged the Caller–Times engaged in monopolistic activity and predatory pricing practices. Triad also alleged tortious interference with Triad's contractual relationships.[2] Triad based its

---

1. The trial court granted Triad injunctive relief which restrained the Caller Times "from targeting Plaintiff's customers or potential customers for special deals or concessions." The injunction was granted under the authority of section 15.21(b) of the Texas Business and Commerce Code. The Caller–Times challenged the injunction on the ground that it was overbroad and vague. Triad conceded that the injunction was overbroad and vague and the court of appeals dissolved the injunction. 791 S.W.2d 163, 174. The injunction was not an issue in this court.

2. Prior to the filing of the instant suit in state court, the majority shareholders in Triad Communications, David Mock and George Magel, filed suit twice in federal district court against the parent corporation of the Caller–Times, Harte–Hanks Communications, Incorporated, seeking relief under the Sherman Act from the Caller–Times' allegedly monopolistic conduct. The first time, the federal claims were dismissed without prejudice at the request of Mock and Magel. The federal claims were refiled and then dismissed with prejudice in November of

claims on the allegation that the Caller–Times "targeted" Wheels and Keels' customers, offering them special deals and advertising rates if they would advertise in the Caller–Times' publications. Triad alleged that these actions caused damages from lost sales, and eventually drove Wheels and Keels out of business.

The jury found that the Caller–Times had targeted Triad's customers for special deals and that such targeting had proximately caused Triad damages of $364,-416.00. Pursuant to jury findings that require the court to treble damages under the Texas Antitrust Act, the trial court rendered judgment for Triad in the amount of $1,096,248.00, and ordered the payment of prejudgment interest and attorney's fees. The trial court also rendered an order granting Triad injunctive relief.

The Caller–Times appealed the trial court's judgment, arguing first that the trial court erred in overruling its motion for judgment *non obstante veredicto*. The Caller–Times contended that Triad failed to prove the Caller–Times' advertising rates were set below its average variable cost. This failure, argued the Caller–Times, was fatal to a claim of predatory pricing. The Caller–Times also argued that the evidence was both legally and factually insufficient to support Triad's tortious interference with contract claims. On rehearing, the court of appeals dissolved the injunction on the ground that it was overbroad and vague but affirmed the trial court's judgment on the basis of a test the court of appeals promulgated for proving predatory pricing. 791 S.W.2d 163.

The test set out by the court of appeals, which is a hybrid test taken from opinions of the United States Courts of Appeals for the Ninth and Eleventh Circuits, mixes subjective and objective proof of predatory pricing. The test requires that to recover under a claim of predatory pricing, a plaintiff must prove that the defendant (1) set its prices below its average total costs, and (2) exhibited some subjective or objective characteristics of predatory conduct. The court of appeals found that the evidence was replete with proof of subjective intent of predatory conduct because the evidence showed that the Caller–Times had called on Wheels and Keels' customers and offered them special deals.

The court of appeals determined that the testimony of Stephen Sullivan, the Caller–Times' publisher, proved the Caller–Times set prices below its average total costs. Sullivan testified that the profit margin on both the Caller–Times and the Pennysaver was twelve percent, plus or minus five percent. Using this general figure, the court of appeals determined that the Caller–Times' total costs were between eighty-three and ninety-three percent of its revenues. At trial, evidence was offered that the Caller–Times offered deals to Wheels and Keels' customers of up to fifty percent off the Caller–Times' regular advertising rates. The court of appeals determined that at fifty percent off its advertising prices, the Caller–Times was pricing its advertising thirty-three percent below its lowest break-even point of eighty-three percent. This, the court of appeals determined, was evidence that the Caller–Times set its advertising rates below its total costs; thus, the jury finding that the Caller–Times engaged in predatory pricing had support in the evidence.

## II.

On appeal, the Caller–Times complains of the court of appeals' judgment in several respects, most notably in regard to the predatory pricing test the court of appeals devised under the Texas Antitrust Act. That statute was a sweeping reform of the former Texas antitrust act originally passed in 1889, one year before Congress passed the Sherman Antitrust Act. Baron, *Increasing Importance of State Antitrust Enforcement: The Texas Free Enterprise*

1985. Mock and Magel had requested a second dismissal without prejudice. However, the court granted dismissal with prejudice. In its order, the court stated that the dismissal was with prejudice because the cause had already been dismissed once without prejudice, because of the costs incurred by Harte–Hanks, and because the judge felt that Mock and Magel were only forum shopping.

*and Antitrust Act,* in State Bar of Texas Institute: Antitrust in the 80's C–1 (1985); Comment, *The Texas Free Enterprise and Antitrust Act—Analysis and Implications,* 22 Hous.L.Rev. 1181, 1181–83 (1985). The 1983 Texas Antitrust Act was specifically designed to update Texas antitrust law and afford courts broader powers of protection than that provided by the "laundry list" of particular violations set out in the 1889 Texas antitrust act. *See* Baron, *supra,* at C–1; Comment, *supra,* at 1182–83. The powers of protection provided by the 1983 Texas Antitrust Act were considered broader because it provides the courts the flexibility to adapt legislative intent to evolving economic and business conditions. Comment, *supra,* at 1190–91.

The current Texas Antitrust Act is modeled on both the Sherman Antitrust Act and the Clayton Act. Comment, *supra,* at 1183 n. 9. Consistent with its foundation in federal law, the Texas Antitrust Act provides that it is to be interpreted in harmony with federal judicial interpretations of comparable federal laws. Tex.Bus. & Com.Code § 15.04.

Triad sued the Caller–Times for damages caused by its allegedly monopolistic conduct, seeking to invoke the protection of section 15.05(b) of the Texas Antitrust Act. That section provides: "It is unlawful for any person to monopolize, attempt to monopolize or conspire to monopolize any part of trade or commerce." Tex.Bus. & Com. Code § 15.05(b). Section 2 of the Sherman Antitrust Act provides in relevant part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2 (1988). Because section 15.05(b) of the Texas Antitrust Act is comparable to section 2 of the Sherman Antitrust Act, we look to federal law interpreting section 2 of the Sherman Act for guidance in interpreting section 15.05(b) of the Texas Antitrust Act.

■ Initially, we note that both the Sherman Act and the Texas Antitrust Act cover monopoly and attempted monopoly. Triad alleges monopoly, which is established if two elements are proven: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. I.T.T. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The first element, which is not an issue on appeal, was resolved in favor of Triad when the jury found that the Caller–Times had monopoly power in the relevant market. A plaintiff may establish the second element with a showing that the monopolist charged predatory prices.[3] The second element was resolved in favor of Triad when the trial court found predatory pricing based on evidence of subjective intent. Triad presented no evidence on cost data. 791 S.W.2d at 167. The court of appeals held that Triad must show that the Caller–Times was charging below its average total cost and that a statement by the Caller–Times' publisher on the profit margin of the Caller–Times was sufficient to show below average-total-cost pricing.

The issue on appeal is what constitutes proof of predatory pricing. This is a question of first impression under the Texas Antitrust Act. Federal courts, however, have addressed the question of predatory pricing on a number of occasions.

Section 15.04 of the Texas Antitrust Act allows Texas courts to draw from the law of any circuit in guiding their interpretation of the Act.[4] This provision gives this

---

**3.** *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 696 n. 12, 702, 87 S.Ct. 1326, 1332–33 n. 12, 1336, 18 L.Ed.2d 406 (1967); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 722 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

**4.** Some testimony during hearings on the 1983 Texas Antitrust Act urged the legislature to incorporate language into the Act which would specifically direct Texas courts to follow the Court of Appeals for the Fifth Circuit as a matter of course when there is no Supreme Court precedent and there is a conflict between cir-

Court wide latitude in developing an appropriate test. However, because the Supreme Court has not developed a test for predatory pricing, and the federal circuit courts take different approaches, this provision also requires determining which federal approach best guides our interpretation of the Texas Antitrust Act. Although we seek to harmonize our interpretation with federal law to the extent it is consistent with the purpose of the Texas Antitrust Act, we decline to follow any one circuit. Rather, we draw on the interpretations of several circuits as an aid in developing an appropriate test.

A test for predatory pricing cannot be developed in a vacuum. We note several policies which underlie an appropriate test. Section 15.04 of the Texas Antitrust Act provides that the Act's purpose is to maintain and promote economic competition and to provide the benefits of that competition to consumers in the state. The Texas Antitrust Act seeks to provide a level playing field to benefit the consumers of the state. There is no statutory mandate as to who must win the competition. The purpose of the Act is to protect competition and not individual competitors. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 116, 107 S.Ct. 484, 492, 93 L.Ed.2d 427 (1986); *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

Further, a vague standard has a chilling effect on business.[5] Business must be able to determine prospectively what price it may legally charge. *See Henry v. Chloride, Inc.,* 809 F.2d 1334, 1346 (8th Cir. 1987); *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 722–23 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). When a court focuses on subjective intent,

a seller cannot predict where it may legally set a price. The test developed by the court of appeals focuses on subjective intent. This standard creates a lack of predictability in the law which punishes those who would engage in vigorous competition.

## III.

■ The appropriate test for predatory pricing under the Texas Antitrust Act has two elements. The first element is whether the predatory pricing is economically feasible. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 598, 106 S.Ct. 1348, 1362, 89 L.Ed.2d 538 (1986) (rational economic motive is a threshold question); *Henry v. Chloride, Inc.,* 809 F.2d at 1345. Unless predatory pricing is economically plausible, business has no motive to engage in that practice.[6] *See Matsushita,* 475 U.S. at 595, 106 S.Ct. at 1360; *United States v. Syufy Enterprises,* 903 F.2d 659 (9th Cir.1990); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396, 1401 (7th Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); S. Breyer, *Regulation and its Reform* 32 (1982); F. Scherer, *Industrial Market Structure and Economic Performance* 335–340 (2nd ed. 1980). Predatory pricing is only economically feasible when a company has an objectively reasonable expectation of recouping its losses from predatory pricing by charging higher prices later. ' *See Cargill,* 479 U.S. at 117–19, 107 S.Ct. at 492–94; *A.A. Poultry Farms,* 881 F.2d at 1401; *Henry v. Chloride, Inc.,* 809 F.2d at 1345; *Adjusters Replace-A-Car v. Agency Rent-A-Car, Inc.,* 735 F.2d 884, 894 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *Barry Wright Corp.,* 724 F.2d at 231; *Northeast-*

---

cuits. Comment, *supra,* at 1199. This suggestion was rejected. Instead, § 15.04 allows Texas courts to draw their interpretations from any of the federal circuits. Comment, *supra,* at 1199; *see* State Bar of Texas Antitrust Section, *Monograph: Texas Free Enterprise and Antitrust Act* 33 (1984).

**5.** *See, e.g., Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 88

(2nd Cir.1981); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 235 (1st Cir.1983).

**6.** This element of the test is equally appropriate even if the seller acts irrationally. Whether a seller acts rationally or irrationally, predatory conduct will be marked by the same objective factors. The fact finder can determine whether there was an objective rational economic motive even if the seller acted irrationally.

*ern Telephone*, 651 F.2d at 89; *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1034–35 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); R. Rapp, *Predatory Pricing Analysis: A Practical Synthesis*, 59 Antitrust L.J. 595, 598–603 (1991); F. Easterbrook, *Predatory Strategies and Counterstrategies*, 48 U.Chi. L.Rev. 263 (1981); P. Joskow & A. Klevorick, *A Framework for Analyzing Predatory Pricing Policy*, 89 Yale L.J. 213, 242–49 (1979); R. Posner, *Antitrust Law: An Economic Perspective* 184–92 (1976). Therefore, to meet its burden under this element, a plaintiff must prove that the alleged predator has an objectively reasonable expectation of recouping its losses from predatory pricing by charging higher prices later. The seller will not have an objectively reasonable expectation of recouping its losses unless the structure of the relevant market will permit the seller to recoup its losses from predatory pricing.[7] When a company charges prices that are above a competitive price in a market that does not have significant barriers to entry, new competition enters the market and prices must be lowered to maintain market position. *See Matsushita*, 475 U.S. at 589, 106 S.Ct. at 1357. Therefore, market structure can make recoupment impossible. "Only if market structure makes recoupment feasible need a court inquire into the relation between price and cost." *A.A. Poultry Farms*, 881 F.2d at 1401.

The requirement that predatory pricing be economically feasible is consistent with the goal of providing the benefits of competition to the consumers of the state. This standard helps create a rule that businesses can readily follow which allows them to cut prices as low as possible. Low prices for consumers are an ultimate goal of the Texas Antitrust Act. If the market structure does not allow recoupment later, then consumers benefit from a period of low prices. There is no down side because, by definition, if the market does not allow later recoupment the monopolist cannot charge higher prices later. Consumers cannot lose if the market does not allow recoupment. *See A.A. Poultry Farms*, 881 F.2d at 1401.

The dissent attributes this Court's economic position to Robert H. Bork and his work *The Antitrust Paradox* (1978). The Court neither cites nor relies on *The Antitrust Paradox*. Rather, the Court relies on the decision of the United States Supreme Court in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Supreme Court's economic analysis in *Matsushita* follows from a line of Supreme Court precedent starting with *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). *See, e.g., Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir.1984).[8]

---

**7.** We are not faced with the question of what factors a court should consider to determine whether a seller will have an objectively reasonable expectation of recouping its losses. Relevant factors must be determined on a case by case basis. While we neither endorse every factor on this list nor exclude any other factor, we anticipate that the following factors would be relevant: the type of goods or services in question; the economic condition of the predator; relative market strength of the seller; the number of competitors in the relevant market; nature of barriers to market entry; market demand; and the name recognition of the seller's products.

We neither reject nor embrace the rule of reason as a tool for analysis of predatory pricing problems. However, by considering the objective factors peculiar to a particular business, the first part of this test is entirely consistent with the rule of reason. *See The White Motor*

*Co. v. United States*, 372 U.S. 253, 261, 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963). "[T]he Rule [of Reason] does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). *See generally* P. Joskow & A. Klevorick, *A Framework for Analyzing Predatory Pricing Policy*, 89 Yale L.J. 213 (1979) (discussing the interaction of the rule of reason and per se rules in the context of predatory pricing analysis).

**8.** The Seventh Circuit noted in *Brunswick* that "[t]he purpose of the antitrust laws as it is understood in the modern cases is to preserve the health of the competitive process ... rather than to promote the welfare of particular com-

The second part of the test for predatory pricing is established by proving the seller set its prices below "some appropriate measure of cost." *Matsushita*, 475 U.S. at 584 n. 8, 106 S.Ct. at 1355 n. 8. The *Matsushita* Court expressly declined to identify what constitutes an appropriate measure of cost. *Id.* Although the United States Supreme Court has not resolved the question of what constitutes an appropriate measure of cost, a number of federal circuit courts have addressed the issue.

The starting point for a predatory pricing analysis in the federal circuit courts is Ar-

eeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975).[9] Areeda and Turner argue that marginal cost[10] is the ideal measure of predatory pricing. However, accountants generally cannot determine marginal cost from data kept by most companies.[11] Average variable cost is an effective substitute for marginal cost and may be readily determined from cost data that most companies keep.[12] Average variable cost is defined as the costs that vary with changes in output divided by the output.[13] *International Air Industries, Inc. v. American Excelsior*

---

petitors." 752 F.2d at 266. (citing *Brown Shoe*). Perhaps one reason why the dissent takes such a different view of the purpose of the antitrust laws is that the dissent relies on the position of turn of the century writers. The business environment and the tools for analysis of the business environment in this country have changed since Louis D. Brandeis wrote on antitrust in 1914.

The dissent manages to infer from this opinion that it is predicated on the belief that predatory pricing is rare. The dissent argues that "predatory pricing is a real danger," at 603, and cites commentators for the proposition that predatory pricing exists. At 603, n. 46. However, the dissent has not answered the Second Circuit's challenge in *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 88 (2nd Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). The *Northeastern* court noted that "nowhere in the recent outpouring of literature on the subject do commentators suggest that [predatory] pricing is either common or likely to increase." *Id.* There is a difference between saying that predatory pricing exists and saying that it is a real danger.

**9.** *See, e.g., A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); *Henry v. Chloride, Inc.*, 809 F.2d at 1345; *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 888–91 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 231–34 (1st Cir.1983); *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 86 (2nd Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1038 (9th Cir. 1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982).

**10.** Marginal cost is the incremental cost of making and selling the last unit.

**11.** Areeda & Turner, *supra*, at 716.

**12.** Areeda & Turner, *supra*, at 717–18; *Northeastern Telephone*, 651 F.2d at 87.

**13.** When determining whether a cost is fixed or variable

> [t]he characterization of legitimately disputed costs is a question of fact for the jury. *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 891 n. 6 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *see William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1036–38 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). The jury may consider, but obviously cannot be bound by, a party's characterization of its own costs.

*Kelco Disposal v. Browning-Ferris Industries*, 845 F.2d 404, 408 (2nd Cir.1988), *aff'd on other grounds*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989).

Average variable cost must be determined for the relevant product market. Analysis of a monopoly claim begins with consideration of what is the relevant market. *See, e.g.*, Kintner, *2 Federal Antitrust Law* § 12.2 (1980); Areeda & Turner, *2 Antitrust Law* ¶ 525 (1978); *Kaiser Aluminum & Chemical Corp. v. FTC*, 652 F.2d 1324 (7th Cir.1981). The relevant market consists of both the geographic market area as well as the product market. *See, e.g.*, Kintner, *supra*; *2 Antitrust Law* ¶ 525; *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360 (9th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); *C.E. Services, Inc. v. Control Data Corp.*, 759 F.2d 1241 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985). Products are generally in the same market if they are reasonably interchangeable. *See, e.g., United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Kintner, *supra*, at § 12.3.

*Co.,* 517 F.2d 714, 724 n. 27 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). Areeda and Turner argue that if a firm sets its prices above its average variable cost an irrebuttable presumption is created that there is no predatory pricing. If a firm sets its prices below its average variable cost then an irrebuttable presumption is created that there is predatory pricing. Areeda and Turner do not consider any evidence of subjective intent. Indeed, Areeda notes in a later work that: "Some courts almost seem to overlook the fact that predatory pricing is the evil, and write sometimes as if the conduct is important only because it is evidence of the firm's evil intent." Areeda & Hovenkamp, *Antitrust Law* ¶ 714.52b n. 5 (Supp. 1988). Although no circuit has adopted the test exactly as proposed by Areeda and Turner, average variable cost is commonly used as will be discussed below.[14]

The Ninth Circuit used the Areeda and Turner test as a starting point and then expanded the inquiry into a three-part analysis. The analysis creates different presumptions depending on whether the price charged is below average variable cost, between average variable cost and average total cost, or above average total cost. *Inglis,* 668 F.2d 1014, 1035–36 (creates the first two elements); *Transamerica Computer Co., Inc. v. International Business Machines Corp.,* 698 F.2d 1377, 1388 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983) (adds the third element). The *Inglis/Transamerica* test provides that: (1) when prices are above average total cost the plaintiff has the burden of proving by clear and convincing evidence that there was predatory pricing (*Transamerica*); (2) when prices are below average total cost but above average variable cost the plaintiff has the burden of proving by a preponderance of the evidence that there was predatory pricing (*Inglis*); and (3) when prices are below average variable cost a prima facie case of predatory pricing is established and the defendant has the burden of proving by a preponderance of the evidence that its prices were justified without regard to any anticipated destructive effect they might have (*Inglis*).

The *Inglis* segments of the Ninth Circuit test for predatory pricing have been followed to varying degrees by the Sixth,[15] Eighth,[16] Tenth,[17] and Eleventh[18] Circuits. The *Transamerica* segment of the Ninth

---

**14.** *See Henry v. Chloride, Inc.,* 809 F.2d 1334, 1345 (8th Cir.1987); *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 890 n. 5 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985).

**15.** *D.E. Rogers Associates, Inc. v. Gardner–Denver Co.,* 718 F.2d 1431, 1437 (6th Cir.1983), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984) (adopts without analysis the *Inglis* portion of the Ninth Circuit test; plaintiff did not show that prices were below average variable cost so the area between average variable cost and average total cost was not an issue); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050 (6th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984) (adopts the *Inglis* segments but expressly rejects the *Transamerica* segment in case that involved pricing above average total cost).

**16.** *Henry v. Chloride, Inc.,* 809 F.2d 1334 (8th Cir.1987) (prices above average total cost are presumptively legal; uses average variable cost as a dividing line for burden of proof—plaintiff has the burden of proof above average variable cost and defendant has the burden of proof on predatory pricing below average variable cost; prices were below average variable cost); *Mor-*

gan *v. Ponder,* 892 F.2d 1355, 1360 (8th Cir. 1989) ("At prices above average variable cost the plaintiff must overcome a strong presumption of legality...."; evidence was insufficient to show pricing below average total cost).

**17.** *Instructional Systems Development Corp. v. Aetna Casualty and Surety Co.,* 817 F.2d 639, 648 (10th Cir.1987) (sales above average variable cost do not preclude a finding of predatory pricing if other factors are present indicating unreasonably anti-competitive behavior; the court relied on objective evidence of pricing patterns to establish predatory pricing when prices were above average variable cost); *Pacific Engineering & Production Co. v. Kerr McGee Corp.,* 551 F.2d 790, 797 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) (used Areeda and Turner test based on average variable cost but declined to adopt a rule based only on cost).

**18.** *McGahee v. Northern Propane Gas, Co.,* 858 F.2d 1487 (11th Cir.1988), *cert. denied,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989) (uses the *Inglis* test and expressly allows a showing of subjective intent to engage in predatory pricing).

Circuit test which allows a plaintiff to show that prices above average total cost are predatory has not been followed by any other circuit. Further, all circuits but the Eleventh take a very limited view of what may be shown for a party to meet its burden of proof on predatory pricing. The element of proof that the Ninth Circuit test requires in addition to showing the relationship between price and cost is a showing "that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." *Inglis*, 668 F.2d at 1035. Subjective evidence of a defendant's intent to engage in predatory pricing does not meet the requirements of the *Inglis/Transamerica* test.

We decline to follow the Ninth Circuit approach to prices above average variable cost. The Ninth Circuit divides costs above average variable costs into two groups: (1) those above average total cost; and (2) those above average variable cost but below average total cost. Initially, the Ninth Circuit approach to prices above average total cost is clearly against the great weight of federal authority.[19] Second, the Ninth Circuit approach to finding predatory pricing in prices that are above average variable cost is inconsistent with the stated objectives of the Texas Antitrust Act. The Ninth Circuit notes that "[p]ricing below average total cost may be a legitimate means of minimizing losses, particularly when the firm is 'temporarily' experiencing 'excess capacity' in its productive facilities." *Inglis*, 668 F.2d at 1035. We can also foresee other situations where a firm may legitimately price below its average total cost. Start-up periods, periods of falling demand, loss-leaders and promotional activities are other examples of legitimate pricing below average total cost.[20] In the short-run, a firm maximizes its profits when its prices are above its average variable costs. Forcing a company to charge above its marginal cost is a waste of economic resources. *See International Air*, 517 F.2d at 724.

The Ninth Circuit notes that "[a]lthough pricing below average total cost and above average variable cost is not inherently predatory, it does not follow, however, that such prices are never predatory." *Inglis*, 668 F.2d at 1035. The Ninth Circuit's primary concern with prices that are above average variable price appears to be the practice of limit pricing.[21] *Inglis*, 668 F.2d at 1033. Although we share the Ninth Circuit's concern, we seek a solution that

**19.** *See McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1496 (11th Cir.1988), *cert. denied,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989) (cannot infer predatory intent when the price charged is above average total cost); *Henry v. Chloride, Inc.,* 809 F.2d 1334 (8th Cir.1987) (prices above average total cost are conclusively legal); *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.,* 735 F.2d 884 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985) (the appropriate test for predatory pricing is average variable cost); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050, 1056 (6th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984) (follows Ninth Circuit Test but expressly rejects the *Transamerica* segment that considers prices that are set above average total cost; forcing firms to price above their average total cost would prevent procompetitive price cuts which are beneficial to consumers and other purchasers); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 234–36 (1st Cir.1983) (any test that considers prices above average total cost to be predatory "would more likely interfere with the procompetitive aims of the antitrust laws than further them"); *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1122–23 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76 (2nd Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (the appropriate test for predatory pricing is average variable cost).

**20.** *See, e.g.,* H. Hovenkamp, *Economics and Federal Antitrust Law* § 1.1 (1985).

**21.** Limit pricing is the monopolist's practice of pricing below its profit-maximizing price but above the price at which competitors may economically enter the market. *See, e.g.,* Scherer, *Industrial Market Structure and Economic Performance* 332–43 (2nd ed. 1980); Areeda & Turner, 3 *Antitrust Law* ¶ 714b (1978). An oversimplified example is when

the monopolist's profit-maximizing price is $100 per unit, but a $100 price would attract entry while a $90 price would not. Average total costs (including a normal return on investment) at an efficient scale of output might be $80 to the monopolist but $91 for newcomers. In that event, the monopolist will have to

provides greater certainty for business and consequently increased competition and lower prices for consumers. *See International Air,* 517 F.2d at 721–23; Scherer, *supra,* at 332–43. Generally, prices between average variable cost and average total cost are competitive and socially optimal. *See Henry v. Chloride, Inc.,* 809 F.2d at 1345–46. Therefore, we will not follow the Ninth Circuit approach of allowing proof that a price above average variable cost is predatory. However, we will consider other federal approaches to the problem of limit pricing.

The other widely used test for predatory pricing, besides that of the Ninth Circuit, focuses on average variable cost and is used by the First, Second, and Fifth Circuits. Like the Ninth Circuit approach, the First, Second, and Fifth Circuits start with the test proposed by Areeda and Turner. The Fifth Circuit addressed the Areeda and Turner approach first in *International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). The *International Air* court adopted the basic Areeda and Turner formulation but carved out an exception for cases of limit pricing. 517 F.2d at 724. The First and Second Circuits independently developed tests based solely on pricing above or below average variable cost without following *International Air.* All three circuits have the presumption that prices above average variable cost are legal and prices below average variable cost are illegal.

The Second Circuit noted in *Northeastern Telephone Co. v. American Telephone & Telegraph Co.* that the appropriate inquiry for developing a price standard is to determine when prices become unremunerative. 651 F.2d 76, 87 (2nd Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). Marginal cost pricing allows a firm to recover its cost of producing the last unit sold. If a seller cannot

cover its marginal cost then it should normally discontinue production. The seller is not only losing its fixed costs but is losing its incremental costs as well. *See Barry Wright,* 724 F.2d at 232. Marginal cost pricing fosters competition on the basis of relative efficiency. *See Northeastern Telephone,* 651 F.2d at 87. This is consistent with the Texas Antitrust Act's stated purpose of maintaining and promoting economic competition for the benefit of consumers. Marginal cost pricing is remunerative and should be permissible. As we have noted, average variable cost is the accountant's surrogate for marginal cost. Therefore, a price above average variable cost will not support a charge of predatory pricing unless there are substantial barriers to entry into the relevant market.

The Fifth Circuit recognizes an exception to the general rule when there are substantial barriers to market entry. *International Air,* 517 F.2d at 724. This exception is supported by *Matsushita,* in which the Supreme Court stated that unless there were barriers to entry into a market it would presumably be impossible to maintain prices above a competitive level for an extended time. 475 U.S. at 591 n. 15, 106 S.Ct. at 1358. Prices above a competitive level are necessary for a predator to recoup the losses incurred in pricing below average variable cost and profit from its actions. Without the ability to price above a competitive level there is no economic motive to engage in predatory pricing.

The Fifth Circuit's exception for when substantial barriers to market entry exist requires that the price charged be above the seller's short-run profit-maximizing price. *Adjusters Replace–A–Car v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 890–91 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985); *International Air,* 517 F.2d at 724. This exception addresses the limit pricing problem that appears to have been the driving force behind the Ninth Circuit's treatment of

choose between inducing entry at the profit-maximizing price of $100 and retaining the entire market at the $90 price. If the discounted income stream at the lower price exceeds that from sharing the market at the

higher price, the monopolist will charge the lower price. Although the lower price would thus be the long-run, profit maximizing price, it is usually called a 'limit price'....

3 *Antitrust Law* ¶ 714b.

prices above average variable cost. The Fifth Circuit approach allows a greater range of prices without the uncertainty that stifles competition to the detriment of consumers. However, this exception is unimportant for our purposes because there is no evidence that there were substantial barriers to entry into the advertising market in the Corpus Christi area.

■ The subjective intent of a seller should not be a factor in determining whether its prices are predatory. This is the approach taken by the First,[22] Second,[23] Fifth,[24] Seventh,[25] and Eighth[26] Circuits. The danger of evidence of subjective intent is that "[p]redatory pricing is difficult to distinguish from vigorous price competition" and subjective evidence blurs the distinction. *Northeastern Telephone*, 651 F.2d at 88. This is because subjective evidence of predatory intent can be ambiguous and misleading. As a result, juries may "erroneously condemn competitive behavior." *Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir.1989).

Claims of predatory pricing generally arise when a seller seeks to increase market share through price cutting. These efforts are permissible even if their result is to decrease the rivals' share. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116, 107 S.Ct. 484, 492, 93 L.Ed.2d 427 (1986). This is just recognition that the goal of all competition is to capture as much, if not all, of the business for yourself which will necessarily affect, if not destroy your competitors. Antitrust laws do not prohibit this activity.

Rivalry is harsh, and consumers gain the most when firms slash costs to the bone and pare price down to cost, all in pursuit of more business.... If courts use the vigorous, nasty pursuit of sales as evidence of forbidden 'intent,' they run the risk of penalizing the motivation forces of competition.

*A.A. Poultry Farms*, 881 F.2d at 1401–02.

Not only is evidence of subjective intent misleading to the jury, but it also leaves a standard that is too vague for businesses to follow. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir. 1983). In the absence of a clear standard, business will tend to err on the side of keeping prices high and consumers will be the ultimate losers. *Id.* This result is contrary to the purpose stated in section 15.04 of the Texas Antitrust Act.

The legal environment for small business is tough enough. An antitrust standard which focuses on whether a seller had improper thoughts about its competitors only makes the legal environment worse. A test focusing on conduct provides a much more certain guideline for business.

In addition to applying an incorrect standard, the court of appeals improperly combined a showing of predatory pricing with a

22. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir.1983) (adopts a cost based test and declines to consider intent).

23. *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 651 F.2d 76, 88 (2nd Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (adopts a straight Areeda and Turner test; the Eighth Circuit noted in *Henry v. Chloride*, 809 F.2d 1355, 1358 (8th Cir.1987), that the presumptions created in *Northeastern Telephone* were conclusive).

24. *Adjusters Replace-A-Car v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 890 (5th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985) ("The objective economic approach to predation that we adopted in *American Excelsior* is still the law of this circuit." "[W]here barriers to entry are not pronounced predatory pricing is not established unless the defendant has set his prices below his average variable cost." 735 F.2d at 891.); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

25. *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 530 (1990) ("Following the First Circuit's decision in *Barry Wright*, we now hold that intent is not a basis of liability (or a ground for inferring the existence of such a basis) in a predatory pricing case under the Sherman Act.").

26. *Morgan v. Ponder*, 892 F.2d 1355, 1359–60 (8th Cir.1989) ("objective cost analysis is the crucial component in a prima facie case of predatory pricing;" prices above average total cost are per se legal; "[A]s our cases have made clear, evidence of statements [of subjective intent] will not relieve a plaintiff of the burden of proving predation through a separate showing of predatory conduct.").

showing of what is required to obtain treble damages. Section 15.21(b) of the Texas Antitrust Act provides that the trier of fact must award treble damages if the unlawful conduct was willful or flagrant. Tex.Bus. & Com.Code § 15.21(a)(1). The requirement of willful or flagrant conduct to treble damages is above and beyond what is required to prove predatory pricing. It is improper to combine the requirements of section 15.21(a)(1) into the elements of the test for predatory pricing under section 15.05(b). We are not presented with and do not address the question of what is appropriate proof of willful or flagrant conduct for purposes of section 15.21(a)(1).[27]

We therefore adopt the following test for predatory pricing: (1) the seller has an objectively reasonable expectation of recouping its losses due to the alleged predatory pricing by charging higher prices later, that is, the predatory pricing is economically feasible; and (2)(a) the price charged is below average variable cost; or (b)(i) there are substantial barriers to market entry; (ii) the seller is charging a price below its short-run profit-maximizing price and its average total cost;[28] and (iii) the benefits of the seller's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power.

### IV.

■ The appropriate measure of cost for establishing a claim of predatory pricing was the focus on appeal. Therefore, we address that element of the test before considering the other elements. The test provides that there is predatory pricing when the price charged is below average variable cost. When considering claims of predatory pricing, the trier of fact must have sufficiently precise cost information to allow it to determine average variable cost. *See Clamp All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478, 483 (1st

Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989). In the case at hand, Triad introduced no evidence that the Caller–Times priced its advertisements below the Caller–Times' average variable cost, 791 S.W.2d at 169, or, indeed, below any measure of cost. The testimony of the Caller–Times' publisher that the Caller–Times' profit margin was twelve percent plus or minus five percent does not provide a basis for determining any relevant measure of cost. The evidence that Triad presented at trial shows only that the Caller–Times engaged in "vigorous competition." This is clearly not prohibited under antitrust statutes. Absent any evidence that the Caller–Times set its prices below average variable cost, Triad's monopolization claim fails under this element. Triad may not seek refuge in the exception to the second part of the test because there was no evidence of substantial barriers to entry to the relevant market.[29] Because Triad did not meet its burden on the second part of the test for predatory pricing, we need not consider the first part: whether the alleged predatory pricing was economically feasible.

### V.

■ Having decided that Triad has not established an antitrust violation, we are left with the question whether to remand the antitrust issue for a new trial based on this decision or to render judgment for the Caller–Times. We may remand if the interest of justice demands a new trial. Tex. R.App.P. 180; *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 830 (Tex. 1990); *Sanchez v. Schindler,* 651 S.W.2d 249 (Tex.1983); *Morrow v. Shotwell,* 477 S.W.2d 538 (Tex.1972). Texas antitrust law is sufficiently unsettled that we remand for a new trial on the antitrust question.

### VI.

■ Triad received a favorable jury verdict on the basis of its claims of tortious interference with its business relations in addition to the favorable verdict on the

---

**27.** This opinion does not address the requirements of a criminal violation under section 15.22 of the Texas Business and Commerce Code. This Court does not have jurisdiction over criminal matters. Tex. Const. art. V, §§ 3, 5.

**28.** *See supra* note 19 and accompanying text.

**29.** The record indicates that Triad entered the Corpus Christi and surrounding area advertising market for an investment of $10,000.

antitrust claims. The trial court rendered judgment on the antitrust claims, as those claims provided Triad with the greatest measure of recovery. *See Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.*, 747 S.W.2d 785, 787 (Tex.1988); *Hargrove v. Trinity Universal Ins. Co.*, 152 Tex. 243, 256 S.W.2d 73 (1953). Because we reverse the judgment of the court of appeals and the trial court on the more favorable ground of recovery, Triad is entitled to have its tortious interference with business relations theory considered. *Boyce Iron Works*, 747 S.W.2d at 787.

The court of appeals affirmed the trial court's judgment on the basis of Triad's antitrust claims and did not address the issues raised under the independent ground of tortious interference. We decline to address the issues raised by the tortious interference with business relations claims as they were not addressed by the court of appeals. We therefore reverse the portion of the court of appeals' judgment holding that the Caller–Times violated the Texas Antitrust Act and remand the cause to the court of appeals for consideration of the Caller–Times' points of error on Triad's alternative ground of recovery. After the court of appeals considers the Caller–Times' points of error on the alternative grounds of recovery, the court of appeals shall, if requested by Triad, remand to the trial court for a new trial on the antitrust claims. Of course Triad may only have judgment rendered on one of the alternative theories. However, Triad may elect the more favorable judgment after all of the proceedings we have set out.[30]

The motion for rehearing is granted in part and overruled in part.

DOGGETT, J., dissents joined by MAUZY, J.

30. Triad is entitled to have judgment rendered on the tortious interference claims, if those claims are affirmed, and forego a new trial on the antitrust claims.

* This dissent is to the original November 13, 1991 opinion which was withdrawn by the court on Motion for Rehearing February 26, 1992. For Justice Doggett's dissent on Motion for Rehearing, see p. 603 infra.

1. The quoted language is not hypothetical. As an instruction from management to a sales manager, it provided one basis for a determina-

## DISSENTING OPINION

### November 13, 1991*

DOGGETT, Justice.

"Put [them] out of business. Do whatever it takes. Squish [them] like a bug."[1] A Texas jury will never be able to hear these words, no matter how malicious the utterance of a predator intent on annihilating a Texas business. Representing an extraordinary setback for consumers, independent businesses, and law enforcement, today's opinion imposes faulty economic theory instead of implementing the realistic antitrust protection that the legislature mandated.

Today's opinion embraces the peculiar philosophy of Judge Robert Bork, who has long insisted that the best way to address predatory pricing, price fixing, and other anticompetitive practices is to treat them as curious abstractions and accord them legal approval. Categorizing antitrust cases as "economic asininities,"[2] Bork claims that "efficiency-based monopolies are *always* better for consumers than *any* alternative antitrust can produce. [All business] is better left alone." Robert H. Bork, *The Antitrust Paradox* 196 (1978) (emphasis added) (hereinafter Bork, *The Antitrust Paradox*). With similar enthusiasm, the court effectively declares the death of any meaningful right to object to predatory practices. Of all the many cases discussed today, not one involves a business that has prevailed in a claim against a predator under an exclusively cost based rule of the general type that the court now requires.[3] Professing an awareness that the "environment" encountered by "small business is [already] tough enough," the court offers a

tion of anticompetitive behavior in *Kelco Disposal, Inc. v. Browning–Ferris Indus.*, 845 F.2d 404, 406, 408 (2d Cir.1988), aff'd, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Today's decision concludes that such highly relevant indications of predatory intent must be excluded.

2. Robert H. Bork, *Contrasts in Antitrust Theory: I*, 65 Colum.L.Rev. 401 (1965) (hereinafter Bork, *Contrasts in Antitrust*).

3. *See* Joseph F. Brodley & George A. Hay, *Predatory Pricing: Competing Economic Theories and*

peculiar cure: facilitate the elimination of small business. This approach is like a page from the Old West—"we had to shoot it, to get it out of its pain."

In this tragic first interpretation of the Texas Free Enterprise and Antitrust Act, Tex.Bus. & Com.Code §§ 15.01–.51 (1983), giant enterprises are left to finish off what remains of our already economically hard-pressed independent Texas businesses.[4] Because the purpose of this statute is to promote competition, not monopolization, I vigorously dissent. What is at stake here is not merely the wisdom of the court's endorsement of the position of one major newspaper in this case [5] but the extent of future antitrust enforcement in this state. I would afford the protection that the legislature determined Texas businesses and consumers required, that a Corpus Christi judge and jury attempted to enforce, that the court of appeals affirmed and which this court now rejects.

### I.

While seeking to limit the large combinations and monopolies plaguing Texas consumers and small businesses, the first state antitrust legislation, enacted in 1889, took a very narrow approach.[6] It proscribed enumerated activities without regard to whether competition was actually being limited. The courts mechanically applied these *per se* prohibitions rather than considering the underlying purposes of the statute. *See, e.g., Schnitzer v. Southwest Shoe Corp.,* 364 S.W.2d 373, 375 (Tex. 1963). Some monopolistic practices were not forbidden while other activities involving neither anticompetitive intent nor effect were condemned.[7]

With a steady decline in the relative size of the independent business sector, Texans were by the 1970's confronting far different economic realities than those with which their forebears had coped. Initial legislative attempts to update and strengthen state antitrust law enforcement encountered opposition from some of the largest economic enterprises in the nation. Only after attempts in five separate legislative sessions [8] was it possible to gain final approval for a complete revision of the statutory scheme. Finally, in 1983, the legislature enacted what is conceded to be a "sweeping reform" designed to "afford courts broader powers of protection" than previously available. At 580. This legislative effort had the vigorous support of the state's chief law enforcement officer in two successive administrations, consumer groups, and some Texas businesses.[9]

A major thrust of the antitrust law revision was to eliminate the laundry list of *per se* violations. As one business representative noted, the reform "very substantially improves the posture of business and the

the *Evolution of Legal Standards,* 66 Cornell L.Rev. 738, 768 (1981) (hereinafter Brodley & Hay).

4. The court's insensitivity to the realities of independent business was most recently demonstrated in *Crim Truck and Tractor Co. v. Navistar Int'l. Corp.* 823 S.W.2d 591 (Tex.1991) (Mauzy, J., dissenting).

5. That amicus Texas Daily Newspaper Association endorses the result if not the reasoning of the court can in no way control the outcome. Publishers happy to be today's victor may well find themselves tomorrow's victim.

6. Act of March 30, 1889, last codified at Tex. Bus. & Com.Code §§ 15.01–04 (*amended* by Act of 1983, 68th Leg., R.S. ch. 519, § 1, 1983 Tex. Gen.Laws 3010).

7. *See* Jim Mattox, Attorney General, *Updating Texas' Antitrust Laws: The Texas Free Enterprise Act and Antitrust Act of 1983* 1 (1983) (hereinafter *Updating*); David J. Van Susteren, Comment, *The Texas Free Enterprise and Antitrust Act—Analysis and Implications,* 22 Hous.L.Rev. 1181, 1187 (1985) (hereinafter *The Texas Antitrust Act*). In contrast, the Sherman Antitrust Act, ch. 647, §§ 1–6, 8, 26 Stat. 209 (1890) (the current version is found at 15 U.S.C. §§ 1–7 (1976)), reached types of antitrust violations not covered in the strict Texas statute, provided a private right of recovery, and was conducive to broad construction. For all of these reasons, Texas litigants abandoned state law in favor of federal remedies for antitrust violations. *See* Steven Baron, *A New Era in Texas Antitrust: The Texas Free Enterprise and Antitrust Act of 1983,* 18 Texas Trial L.F. 16 (1983) (hereinafter Baron, *A New Era* ); *The Texas Antitrust Act* at 1182.

8. Tex.S.B. 262, 64th Leg., R.S. (1975); Tex.S.B. 400, 65th Leg., R.S. (1977); Tex.S.B. 165, 66th Leg., R.S. (1979); Tex.S.B. 397, 68th Leg., R.S. (1983) (authored by Doggett); and Tex.S.B. 975, 67th Leg., R.S. (1981) (authored by Farabee).

9. *See* State Bar of Texas Antitrust Section, *Monograph: Texas Free Enterprise and Antitrust Act* 1 (1984) (hereinafter *Monograph* ); Texas

consumer with respect to establishing a Rule of Reason...."[10] Derived from federal antitrust law, the rule of reason considers the facts of each case to determine whether or not the policy behind antitrust law—the preservation of competition—has been violated. As Justice Brandeis explained:

> The true test of legality is whether the restraint [of trade] imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business....

*Board of Trade of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); *see also, e.g., Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 59–62, 31 S.Ct. 502, 515–16, 55 L.Ed. 619 (1911).

In applying the Texas Free Enterprise and Antitrust Act, the rule of reason mandates a determination of whether an alleged violation has any actual anticompetitive purpose or effect.[11] What must be considered is the totality of circumstances, not just an isolated course of business conduct. The jury must be allowed to examine the entire facts of the case and determine whether there was any anticompetitive behavior in contravention of the objectives of the legislature. The new law replaced the

"largely mechanical" application of the prior law,[12] and was designed "to in effect say don't look just at the form of the business relationship, look to see if it really has an anti-competitive effect...."[13]

## II.

Henceforth what must be proven in order to establish predation in Texas is as follows:

> (1) the seller has an objectively reasonable expectation of recouping its losses due to the alleged predatory pricing by charging higher prices later, that is, the predatory pricing is economically feasible; and (2)(a) the price charged is below average variable cost; or (b)(i) there are substantial barriers to market entry; (ii) the seller is charging a price below its short-run profit-maximizing price and its average total cost; and (iii) the benefits of the seller's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power.

At 588 (footnotes omitted). A mere reading of this language suggests how difficult it will be for judges to interpret and for juries to comprehend. Although aware that there has never been judicial adoption of such a strict cost-based test, at 587,[14] the court imposes a standard which may be the most regressive in the nation.[15] Vague and convoluted, this test depends upon unde-

---

Antitrust Act: Hearing on Tex.S.B. 397 Before the Senate Jurisprudence Committee, 68th Leg., R.S. (February 22, 1983) (testimony of David Bragg, Texas Consumer Association, and Carol Barger, Consumer's Union), reprinted in *Monograph,* at 27 & 30; *id.* at 26 (testimony of Gene Fondren, representing the Texas Automobile Dealers Association).

**10.** *Id.* at 26 (testimony of Gene Fondren).

**11.** *See Updating* at 2; *Monograph* at 26; *Texas Antitrust Act* at 1195–96. After enactment of the new Act, "Texas courts *must* evaluate ... business activities under the Act for their actual competitive purpose and effects under the rule of reason." Steven Baron, *Increasing Importance of State Antitrust Enforcement: The Texas Free Enterprise and Antitrust Act,* in State Bar of Texas Institute, *Antitrust in the 80's* C–4 (1985) (emphasis added) (hereinafter Baron).

**12.** *Updating* at 2.

**13.** Texas Antitrust Act: Hearing on Tex.S.B. 397 before the Senate Jurisprudence Committee, 68th Leg., R.S. (February 15, 1983) (testimony of Attorney General Jim Mattox), *Monograph* at 10. Texas commentators have concluded that an action for predation under the Texas act does involve consideration of intent. *See* Baron, *A New Era,* at 18; Selinger, *Sherman Marches on Austin: Some Comments about the New Texas Act,* 47 Tex.Bar J. 56, 60 (1984).

**14.** The test is that of Professors Areeda and Turner. Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 699 (1975) (hereinafter Areeda & Turner).

**15.** Although the court claims that its test is derived from numerous federal courts, at 587, its

fined terms that can only be clarified on a costly battlefield laden with economists and accountants dueling over largely arbitrary and potentially incomprehensible numbers.

As a predicate to this test, the court declares that the "subjective intent of the seller should not be a factor." At 587. Excluding all such evidence of intent to undertake anti-competitive pricing schemes, this new standard is based solely on a checklist of figures on cost, price and profit.[16] Companies pricing above the undefined level of "average variable cost" will never be accountable for predation, while firms charging below that arbitrary line usually will. This is nothing but a return to the mechanical pre-Act practice of "just [looking] at the *form* of the business relationship." [17] Removing all reason from this "rule of reason," the court now stymies the legislative goal of realistic antitrust enforcement and entangles us once again in the impractical strictures of the *per se* rules. "[R]elentless application" of law and economics theory produces "new *per se* rules—that of *per se legality.*" 8

*Texas Antitrust Bulletin,* Oct. 1986, at 24 (emphasis in original).[18]

An examination of this court's economics-driven rule highlights both the difficulty and lack of predictability in its application. In the confusing economic feasibility part of its test, the court fails to explain how without intent evidence a victim can ever show that the predator "has an objectively reasonable expectation of recouping its losses," at 582. Likewise, no guidance is provided regarding what type of evidence can establish this "objective" expectation.

The second part of the test—which is sure to subsume the entirety—is that the price charged be below "average variable cost," a term which the court leaves vaguely defined. In contrast with "fixed costs," such as property taxes, which do not vary with changes in output, "variable costs" are those which do vary with production level, often including such items as labor and maintenance costs.[19] However, the factors which go into calculating "average variable cost" can and do vary in every case.[20] In each firm, there are unique considerations of what costs are variable.[21]

---

test is essentially identical to that set forth in *Adjusters Replace–A–Car, Inc. v. Agency Rent–A–Car, Inc.,* 735 F.2d 884, 889–890 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985), with the exception that the Fifth Circuit does not bar intent evidence. *Id.* at 887, 890–91 & n. 5.

**16.** This move goes even further than the recommendation of Caller–Times, which sought only our endorsement of the newspaper's position under the Fifth Circuit approach, and which did not request a test rejecting all intent evidence. Instead, the court follows the alternative urged by amicus H.B. Zachry Company, which, ironically, accused the Court of Appeals of erring by adopting a test not suggested by the parties.

**17.** *See* text accompanying note 13.

**18.** The court thus lives up to Professor Lawrence Sullivan's prediction that reliance on law and economics in the context of antitrust "may lead to an unduly limited conception of statutory purpose." Lawrence A. Sullivan, *Economics and More Humanistic Disciplines: What Are the Sources of Wisdom for Antitrust?,* 125 U.Pa. L.Rev. 1214, 1218 (1977) (hereinafter *Sources of Wisdom* ).

**19.** Areeda & Turner at 700.

**20.** There has been much debate over what is to be considered variable as opposed to fixed cost. *See, e.g., Kelco Disposal,* 845 F.2d at 407–08 (considering whether equipment depreciation is a fixed cost); *Adjusters Replace–A–Car,* 735 F.2d at 891 n. 6 (costs which are regarded as fixed in the short-run may become variable in the long-run); *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1111 n. 39 (7th Cir.1983); *Marsann Co. v. Brammall, Inc.,* 788 F.2d 611, 613–16 (9th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584 n. 8, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986); Martin S. Simkovic, Comment, *Judicial Tests to Determine Predatory Pricing Before and After Matsushita,* 44 Miami L.Rev. 839, 843 (1990) (hereinafter *Judicial Tests* ); Joel B. Dirlam, *Marginal Cost Pricing Tests for Predation: Naive Welfare Economics and Public Policy,* 26 Antitrust Bull. 769, 788 (1981) (hereinafter *Dirlam*). Average variable cost is also particularly difficult to calculate for new market entrants. See Peter C. Carstensen, *Predatory Pricing in the Courts: Reflection on Two Decisions,* 61 Notre Dame L.Rev. 928, 963 (1986) (hereinafter *Carstensen*).

**21.** Charles P. Shimer, Note, *Predatory Pricing: The Retreat from the AVC Rule and the Search for a Practical Alternative,* 22 B.C.L.Rev. 467, 482 (1981) (hereinafter *Retreat from the AVC Rule* ).

Thus, litigants will be forced to engage in a costly battle of experts over which costs are variable and which fixed, with the outcome unpredictable from one case to the next.[22]

Additionally, there is no justification offered for the selection as the critical variable of "average variable cost" rather than "total fixed cost". The latter term appears to be the intended indicator for federal antitrust purposes. *See McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1499–1500 (11th Cir.1988), *cert. denied*, 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989) (Congress focused on the total cost to produce a product, including a "fair profit" margin).[23]

Neither of the two alleged exceptions to the average variable cost rule offered by the court are readily decipherable. Again the court uses terms without explanation— what constitutes a "substantial barrier to entry" is left to the imagination.[24] Nor does such terminology account for the fact that predatory pricing "itself [may] operate as an effective hindrance to new entry even in situations where the conventional barriers to entry are weak or absent." B.S. Yamey, *Predatory Price Cutting: Notes*

*and Comments*, 15 J.L. and Econ. 129, 142 (1972) (hereinafter Yamey); *see also* Harry S. Gerla, *The Psychology of Predatory Pricing: Why Predatory Pricing Pays*, 39 Sw.L.J. 755, 757 (1985) (hereinafter Gerla).

The second exception to the average variable cost rule occurs when the predator prices below its "short-run profit-maximizing price" *and* its "average total cost." At 586. Since "short-run profit-maximizing price" and "average total cost" may be mutually exclusive terms, it is difficult to comprehend what the court intends.[25] For instance, what is a "short-run profit-maximizing price"? This phrase is so vague as to be meaningless when used in a legal test, for there is and can be no one predictably certain "profit maximizing price" throughout a market. Furthermore, it may be inappropriate to apply a "short-run" standard to predatory pricing, which is premised on long-term strategy. *See* F.M. Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv.L.Rev. 869, 880 (1976) (hereinafter Scherer) (short-run profit maximization is not a rational economic goal; rather, business should rationally be concerned with long-term profits).

**22.** The court offers no explanation for its contradiction in permitting a jury to characterize costs as fixed or variable in a manner that may differ from case to case, at 587, while denying a jury the opportunity to analyze and characterize evidence of intent.

**23.** In fact, average total cost includes a necessary minimum profit, *see McGahee*, 858 F.2d at 1503; because of this, it is unclear what the intended dividing line is in the majority's test between "average variable cost" and "short-run profit-maximizing price."

**24.** The court's lack of definition hides the fact that Bork and other law and economics enthusiasts consider there to be few if any actual barriers to entry. *See Sources of Wisdom* at 1215 (citing the *Report of the White House Task Force on Antitrust Policy*, separate statement of Robert H. Bork); *see also* Brodley & Hay at 770 (noting the difficulty of discerning existence of barriers to entry). The court does not make clear what circumstances will be included as barriers to entry. One reason advanced for the ineffectiveness of predatory behavior is that "the victim [of such pricing] would merely have to show the predator [that the victim has a] new line of

credit to dissuade the predator from attacking," because more credit would indicate that the victim could lower prices to match those of the predator. Bork, *The Antitrust Paradox* at 148; *see also* Harry S. Gerla, *The Psychology of Predatory Pricing: Why Predatory Pricing Pays*, 39 Sw.L.J. 755, 767 (1985) (hereinafter Gerla) (generally regarding the assumed availability of credit, noting that underestimation of problems in raising capital flaws the theory that predatory pricing is ineffective). In today's economy, scarred as it is by the savings and loan crisis, credit has become far more difficult to obtain than in the mid-1970's when Bork wrote. Venture capital for entrepreneurs has been described as the "Berlin Wall" since "money is hardly ever there ... when a business is just starting." Jeremy Schlosberg, *The Start–Up Blues*, The Washington Monthly, Jan. 1989, at 25–27. Thus, lack of available credit arguably could serve as a barrier to entry.

**25.** A further complication stemming from the lack of definition is that short-term profit maximization may be used as part of the test for finding high barriers to entry. *See* Brodley & Hay at 771.

The final element of the court's test, offered as part of the "exception" to the average variable cost rule, is that the benefit of the lowered price must be the "discipline or eliminat[ion of] competition." At 588. While this might otherwise warrant consideration of intent, it is really a simple restatement of the "economic feasibility" part of the test, since it is concerned only with "long-term ability" to reap profits from monopoly.

Economic theory can be a useful tool, but only in skilled hands. "If courts are going to practice economics, they better do so correctly and with some understanding of what they are doing. In the context of antitrust law, economic theory can be a tool of factual analysis or it can be a type of formalistic, doctrinal constraint on relevant factual inquiry." Peter C. Carstensen, *Predatory Pricing in the Courts: Reflection on Two Decisions*, 61 Notre Dame L.Rev. 928, 943 (1986) (hereinafter Carstensen). Over-reliance on a pure cost-based analysis is particularly unwise because such tests are "carved from economic assumptions, not from antitrust statutes and judicial precedents." *McGahee*, 858 F.2d at 1495.

These economic assumptions have numerous shortcomings when applied to the real world and the context of antitrust laws: a cost-based test relying on average variable cost and based on broad economic theories is difficult to apply in specific fact patterns [26]; it is too short-term oriented [27]; it is based on terms so flexible as to be necessarily vague [28]; it ignores economic factors [29]; it relies on implausible, hypothetical scenarios [30]; it excessively favors large, multi-product firms [31]; it assumes a perfect market which simply does not exist in the real world [32]; and it uses economic terms which are inapplicable to actual business accounting standards [33]. As a result of these faults, such a cost-based test is simply too permissive of predatory activity.[34] Of all the cases discussed by the court not one involves any plaintiff ever prevailing under a cost-oriented rule.[35]

The alleged justification for today's misdeed is "predictability," at 581, to protect business from the "chilling effect" of "vague[ness]." At 581. The court's fascination with economic theory has resulted, however, in a predictable *per se* cost-based test made unpredictable. Because of the use of vague terminology, the rule will mechanically be applied, but the result will vary from case to case. Assume a product market in which there are only two competing firms, one of which enjoys highly modernized production facilities involving sub-

---

**26.** Carstensen at 946 (some economists argue that the "static" approach of classical economic price theory has little "relevance to antitrust concerns with the dynamics of [actual] conduct....."); Michael C. Quinn, Note, *Predatory Pricing Strategies: The Relevance of Intent under Antitrust, Unfair Competition, and Tort Law,* 64 St. John's L.Rev. 607, 616 (1990); Dirlam at 799; Paul L. Jaskow & Alvin K. Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213, 222 (1979); *see* Oliver E. Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 Yale L.J. 284, 286–87 (1977) (hereinafter Williamson); Brodley & Hay at 756; Robert Pitofsky, *The Political Content of Antitrust,* 127 U.Pa.L.Rev. 1051, 1066 (1979) (hereinafter Pitofsky).

**27.** Carstensen at 943; Scherer at 890.

**28.** *See* Lawrence A. Sullivan, *Antitrust* § 43, at 110 (1977).

**29.** Scherer at 869 (Areeda and Turner fail to consider the effects of varying the quantity of supply).

**30.** *Id.* at 882–83.

**31.** *See* Dirlam at 791–92.

**32.** Dirlam at 805; *Retreat from the AVC Rule* at 484.

**33.** *Retreat from the AVC Rule* at 483.

**34.** *See* Richard A. Posner, *Antitrust Law: An Economic Perspective* 191–93 (1976); Douglas F. Greer, *A Critique of Areeda and Turner's Standard for Predatory Practices,* 24 Antitrust Bull. 233 (1979).

**35.** *See supra* note 3.

stantial fixed costs, but low variable costs for labor. The second company, identical in size, with older production facilities necessitating more employees, has lower fixed costs and higher variable costs. The first firm, perhaps in an effort to do away with its rival, or perhaps simply as a promotion, drops its product prices below the fixed cost of production, but still above its very low average variable cost. To remain competitive, the second firm joins in a price war, dropping prices to exactly the same level as its rival. Under the court's test, the first firm has not engaged in predatory pricing, but the second, with exactly the same size, same product, same market, and charging exactly the same price is guilty of predation.[36] Ironically, absent intent evidence, the first business, which started the price war, would be entitled to recover from the second under the court's test.

As a result of the court's new rule, large, multi-product firms will be generally ignored. Such an operation can price above its average variable cost, continue to make overall profits, yet drive a specific competitor out of business. This is accomplished by drastically cutting prices on one product while charging higher prices on other products for which there is high demand or which already enjoy market dominance in the relevant market. See Joseph F. Brodley & George A. Hay, Predatory Pricing: Competing Economic Theories and the Evolution of Legal Standards, 66 Cornell L.Rev. 738, 789 (1981) (hereinafter Brodley & Hay). Alternatively, for some types of multicomponent products, the price can be lowered on one component, thereby increasing demand. The firm can create overabundance of that one part, which will result in higher demand for the other components, since more than one part is needed to create a finished product. When demand increases, the price on those other components can be raised drastically. Such behavior, no matter how vicious the

intent, can never be illegal under the court's test. Consumers will suffer from the higher prices on the other products, while competing (and smaller) businesses forced from the market. Ironically, the result is that the bigger the business, the less chance that it will be found to be a monopoly.

### III.

The Texas Free Enterprise and Antitrust Act provides that it will be construed so as to accomplish the purpose of maintaining and promoting competition and providing the benefits of that competition to consumers, and in harmony with federal law to the extent consistent with these purposes. Tex.Bus. & Com.Code § 15.04. Today the court follows the most restrictive of federal precedent, ignoring the state statutory purpose, and seeks to harmonize on a matter for which there is no harmony among the federal courts. Because the state statute, unlike the federal, intends not only to maintain but also to *promote* competition, "Texas courts could require a lesser showing of anticompetitive tendency or effect to establish a violation of the Texas Antitrust Act than a federal court would under federal law." Steven Baron, *Increasing Importance of State Antitrust Enforcement: The Texas Free Enterprise and Antitrust Act,* in State Bar of Texas Institute, *Antitrust in the 80's* C–13 (1985) (hereinafter Baron). Professor Richard Posner has suggested that state legislatures and courts may be best equipped to develop workable antitrust laws. Richard A. Posner, *Exclusionary Practices and the Antitrust Law,* 41 U.Chi.L.Rev. 506, 535 n. 72 (1974) (hereinafter Posner). The Texas Legislature has done its part; the Texas Supreme Court has not. By failing to utilize this opportunity to exercise power on behalf of its citizens independent of the federal judiciary, thereby affording meaningful protection to the state's citizenry,

---

**36.** *See Retreat from the AVC Rule* at 482.

the court ignores both state's rights and state's responsibilities. Texans do not stand to profit by our rejection of that power. Furthermore, an opportunity has been lost to make a worthwhile contribuare tion to the body of antitrust law in this nation, guaranteeing that other states cannot follow what could have been our lead.

Disregarding our State's unique statute, the court looks to federal precedent much like a train traveler observes towns passing along the way—interesting so long as they don't slow reaching the ultimate destination. The court cites authority that does not support barring intent evidence,[37] and disregards opinions in five additional federal circuits which specifically allow such evidence.[38]

The United States Supreme Court has also considered intent evidence to be vital in reaching a finding of predation. In the context of antitrust, "knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences." *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 696 n. 12, 87 S.Ct. 1326, 1333 n. 12, 18 L.Ed.2d 406 (1967), quoting *Appalachian Coals, Inc. v. United States*, 288 U.S. 344, 372, 53 S.Ct. 471, 478, 77 L.Ed. 825 (1933). That Court further recognized that "[c]ourts and commentators alike have noted that the existence of predatory intent might bear on the likelihood of injury to competition." *Id.*, 386 U.S. at 702, 87 S.Ct. at 1336. *See also Aspen Skiing Co. v. Aspen Highlands Skiing*, 472 U.S. 585, 602 & 610, 105 S.Ct. 2847, 2857 & 2861, 86 L.Ed.2d 467 (1985) (upholding a verdict against defendant because "the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its rival."); *White Motor Co. v. United States*, 372 U.S. 253, 261–62, 83 S.Ct. 696, 700–01, 9 L.Ed.2d 738 (1963) (applying a rule of reason and hesitating to establish *per se* violations). Thus, by adopting a rule which purports to exclude all evidence of intent to violate the Texas Free Enterprise and Antitrust Act through predatory pricing, this court adopts a *per se* rule so extreme as to have little precedent in this century. The claim that *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) requires a showing of

**37.** Only two federal courts have ever barred all intent evidence. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir.1983); *A.A. Poultry Farms, Inc. v. Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). Even after *Barry Wright Corp.*, "most [courts] have expressed some reservations about supplanting entirely the intent-based test, and none have adopted a *per se* cost based test." *Adjusters Replace–A–Car*, 735 F.2d at 890 n. 5; *see also Judicial Tests* at 844–874. The Fifth Circuit, contrary to the court's assertion, specifically recognizes the admissibility of intent evidence. *Adjusters Replace–A–Car*, 735 F.2d at 887; *see also International Air Indus., Inc. v. American Excelsior Co.*, 517 F.2d 714, 724 n. 30, 726–27 & n. 36 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976). Likewise, the Second Circuit does not explicitly bar such evidence. *Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *Kelco Disposal*, 845 F.2d at 406 (allowing into evidence memoranda illustrative of intent); *see* Robert R. Vawter, Jr. & Sharyn B. Zuch, *A Critical Analysis of Recent Federal Appellate Decisions on Predatory Pricing*, 51 Antitrust L.J. 401, 410 (1983) (*Northeastern* did not conclude that pricing presumptions are conclusive, and it is unclear what evidence is allowable to rebut such presumptions). Finally, the

Eighth Circuit case cited by the court explicitly *allows* for intent evidence; it simply requires more than intent evidence alone. *Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir.1989); *see also Henry v. Chloride, Inc.*, 809 F.2d 1334, 1341 (8th Cir.1987).

**38.** These five circuits, in addition to the Second, Fifth and Eighth Circuits, *see supra*, note 37, are: the Third, *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 347 (3d Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982); the Sixth, *D.E. Rogers Assoc., Inc. v. Gardner–Denver Co.*, 718 F.2d 1431, 1436–37 (6th Cir. 1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); the Ninth, *William Inglis & Sons Baking Co. v. I.T.T. Continental Baking Co., Inc.*, 668 F.2d 1014, 1033–38 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1388–89 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983) (allowing for all intent evidence to be introduced regardless of costs, but shifting the burden of proof); the Tenth, *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 648–49 (10th Cir.1987) (allowing in all intent evidence regardless of costs); and the Eleventh, *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1503 (11th Cir.1988), *cert. denied*, 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989).

"pricing below some appropriate measure of cost," at 583, is misleading, since the Supreme Court explicitly declined to apply a pure cost-based test excluding all intent evidence. 475 U.S. at 584–85 nn. 8 & 9, 106 S.Ct. at 1354–55 nn. 8 & 9. Furthermore, *Matsushita*, which was an action under section 1 of the Sherman Act for conspiracy, is distinguishable from a section 2 action for attempted monopoly.[39] Since the latter involves an *attempt* to monopolize, intent would, by definition, play a central role.[40]

The court's turn away from enforcement of the antitrust laws is derivative of the philosophy of Robert Bork, who questions the wisdom of antitrust laws altogether, labelling them a "paradox" that harms consumers by interfering with the "economic efficiency" of big business, including monopolies. Bork, *The Antitrust Paradox*, at 4, 101 & 196.[41] Rejecting the antitrust jurisprudence of Oliver Wendell Holmes [42] and Louis Brandeis [43], this view prefers the approach of William Howard Taft, generally thought of as an apologist for the giant trusts that dominated America in his era.[44] Though the court denies its lineage to Bork, his thinking pervades the opinion.[45] That predatory conduct is of little concern represents one of the court's major unstated premises. This belief rests not on economic proof but on a generalization that predatory pricing is rare which is derived largely from Bork in *Matsushita*, 475 U.S. at 589–90, 106 S.Ct. at 1357 (citing Bork, *The Antitrust Paradox*, at 149–155), the case upon which the court explicitly "relies". At 581–582.

**39.** 475 U.S. at 584 n. 8, 106 S.Ct. at 1355 n. 8; *see Marsann Co.*, 788 F.2d at 613 n. 1 & 615 n. 3 (*Matsushita* does not apply to section 2 actions).

**40.** *See McGahee*, 858 F.2d at 1496; *Adjusters Replace-A-Car*, 735 F.2d at 887. The somewhat confusing holding in *Matsushita* cannot be read as simply as this court urges. *Matsushita* is highly fact specific: the alleged conspiracy had lasted over twenty years with no success. *Matsushita*, 475 U.S. at 578, 106 S.Ct. at 1351. Additionally, this ruling may apply only to multiproduct firms similar to the Matsushita company itself, for such firms can more easily shift burdens of cost and production from one product to another. This, in turn, affects the ability to apply accurately a cost-based test. Finally, the Supreme Court was concerned only with the context of summary judgment, which is not at issue in the current case. *Id.* at 577, 106 S.Ct. at 1351.

**41.** Describing antitrust as "a subcategory of ideology," Bork, *The Antitrust Paradox*, at 408, or even a "secular religion," Bork, *Contrasts in Antitrust Theory*, at 401, Bork has established himself firmly as an antitrust atheist. This attitude conflicts sharply with the reasoning underlying the federal statutes that "[a]ntitrust is a distinctive American means for assuring the competitive economy on which our political and social freedom under representative government in part depend." *The Report of the Attorney General's National Commission to Study the Antitrust Laws*, quoted in S. Chesterfield Oppenheim & Glen E. Weston, *Federal Antitrust Laws* 4 (1968) (hereinafter Oppenheim & Weston).

**42.** Holmes' dissent in *Northern Securities Co. v. United States*, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904) is described as "a curiously inconsistent piece of work" in which Holmes' view of the Sherman Act "deprives it of any general policy goal and, almost, of any intelligi-

ble reason for existence." Bork, *The Antitrust Paradox*, at 31. Bork characterizes Holmes' interpretation of the statute, which attempted to apply common law, 193 U.S. at 197, 24 S.Ct. at 436, as having "lapsed into an oblivion that seems deserved," and notes its only worth as having included some economic reasoning. R. Bork, *The Antitrust Paradox*, at 32. Holmes was actually one of the first jurists to focus on intent in antitrust cases. *See Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905).

**43.** Brandeis' approach to antitrust law is attacked for his "sympathy for small, perhaps inefficient, traders...." Bork, *The Antitrust Paradox*, at 41. Brandeis is also criticized for not laying out what a formalistic *per se* violation of the antitrust laws is, preferring instead an intent-based or rule of reason approach. *Id.* at 43–44. *See Board of Trade of Chicago*, 246 U.S. at 238, 38 S.Ct. at 243 ("Knowledge of intent may help the court to interpret facts and to predict consequences."). Most remarkably, Bork characterizes Brandeis as having "brought to prominence the idea that judges in antitrust cases could forward values opposed to consumer welfare." Bork, *The Antitrust Paradox*, at 21–22.

**44.** Taft's opinion in *United States v. Addyston Pipe & Steel Co.*, 85 Fed. 271 (6th Cir.1898), is argued to be preferable to the humanistic approach of Holmes and Brandeis because it attempts to establish *per se* rules for illegality. *See* R. Bork, *The Antitrust Paradox*, at 27. Taft's "insight" that combinations might be efficient economically is, to Bork, "central to modern antitrust." *Id.* at 28. At least one commentary has concluded to the contrary that Taft's opinion is utterly out of place in the modern business world. *See* Oppenheim & Weston at 4.

**45.** Ironically, courts are moving towards law and economics just as, at the same time, econo-

The better reasoned position is that of Justice Brandeis, who observes that predatory pricing is "the most potent weapon of monopoly." Louis D. Brandeis, *Competition that Kills in Business—A Profession* 236, 254 (1914). Numerous respected legal commentators and economists have agreed that predatory pricing remains a real danger in today's business environment.[46]

Moreover, predatory pricing was a central concern in the passage of federal antitrust legislation.[47] The House Report on section 2 of the Clayton Act notes that:

In the past it has been a most common practice of great and powerful combinations engaged in commerce—notably the Standard Oil Co., and the American Tobacco Co., and others of less notoriety, but of great influence—to lower prices of their commodities, oftentimes below the cost of production in certain communities and sections where they had competition, with the intent to destroy and make unprofitable the business of their competitors, and with the ultimate purpose in view of thereby acquiring a monopoly in the particular locality or section in which the discriminating price is made.

H.R.Rep. No. 2287, 74th Cong., 2d Sess. 8 (1914). The Senate Report added that:

Every concern that engages in this evil practice [discriminatory pricing] must of necessity recoup its losses in the particular communities where their commodities are sold by raising the price of the same class of commodities above their fair market value. . . .

S.Rep. No. 698, 63d Cong., 2d Sess. 3 (1914).

Convinced that predatory pricing is not a significant concern, the court indulges in a self-fulfilling prophecy by adopting a test which will rarely if ever allow for a showing of predatory pricing. This proposition rests on a still weaker assumption that business decisionmaking is inevitably objective. In its conclusion that "unless predatory pricing is economically plausible, business has no motive to engage in that practice," at 581, the court disregards the real world, where choices are made by human beings who undertake strategies dictated not only by economic reason, but by psychological and business tactics. Posner at 518; Gerla at 756–57; Brodley & Hay at 742 (citing the example of a dominant firm which eliminates one small rival as a "lesson" to other rivals); Oscar E. Williamson, *Predatory Pricing: A Strategic and Welfare Analysis*, 87 Yale L.J. 284, 287 (1970) (hereinafter Williamson). Unfortunately, the court today, like the law and economics enthusiasts whose unrealistic thinking it prefers, has forgotten that the average person is not *"homo economicus"*[48] ("economic person"), but rather *homo sapiens* ("related to persons").[49] Take, for example, the company which instructed its salesmen to put a competitor out of business even if "it meant give [services] away." *Browning–Ferris Indus., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 260–61, 109 S.Ct. 2909, 2912, 106 L.Ed.2d 219 (1989). One purpose of a legal system is precisely to protect potential victims of offenses ranging from murder to securities violations against what is often the irrational behavior of other human beings.

---

mists are moving away from the simplified assumptions of classical microeconomic theory. *See* Gerla at 779 & n. 124.

**46.** These commentators have agreed on the existence of predatory pricing, and have persuasively challenged the premise that it cannot rationally and successfully be employed. Sullivan, *Antitrust* § 43, at 110. *See* Yamey at 130 & 135; Scherer at 883, 889 & generally; F.M. Scherer, *Industrial Market Structure and Economic Performance* 335–40 (2d ed. 1980); Dirlam at 792; Williamson at 286–87; Brodley & Hay at 789; *see generally* Gerla. Even law and economics guru Richard Posner rejects the premise that, from an economist's standpoint, predatory pricing can never successfully occur. Posner at 515–518.

**47.** For a detailed discussion of the legislative history on predatory pricing, see *McGahee,* 858 F.2d at 1498–1500.

**48.** *"Homo economicus"* is a term coined to describe the implausible efficiency and wealth-maximizing creature imagined by classical economists. L. Thurow, *Dangerous Currents* 224 (1983).

**49.** The court's approach is apparent in the very terms of its test. The existence of a "short-term profit-maximizing price" rests purely on a "hypothesis" that firms, in everything they do, aim to maximize profits. *The MIT Dictionary of Modern Economics* (David W. Pearce ed., 2d. ed. 1986).

## IV.

A test better suited for an accurate determination of illegal pricing is one which considers evidence both mathematic and human. Professor Lawrence Sullivan explains in his antitrust law treatise that:

> If we are going to rely on judges and jurors to discover predatory business conduct we cannot deprive them of all traces of the juices of the situation. A firm which seeks to drive out or exclude rivals by selling at unremunerative prices will leave human traces.... If there is one task that judges and juries, informed through the adversary system, may really be good at, it is identifying the pernicious in human affairs. To contend that the conventional formulation ... ought to be amended to one which looks solely to an effect validated by economic studies is to assume too much about the precision of applied economics and to assume too little about the value of more humanistic modes of inquiry.

Lawrence A. Sullivan, *Antitrust* § 43, at 110 (1977). Simply put, and as this court admits, "[a]lthough pricing below average total cost and above average variable cost is not inherently predatory, it does not follow, however, that such prices are never predatory." *William Inglis & Sons Baking Co. v. I.T.T. Continental Baking Co., Inc.,* 668 F.2d 1014, 1035 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *see also* Yamey at 129–135. For this reason, numerous sources have advocated consideration of intent evidence in defining predatory pricing.[50] To do otherwise by substituting cost rules for intent evidence will result in "*economically* unsound decisions." Scherer at 890 (emphasis added).

The advantage of admitting intent evidence is that it offers "vital elements of flexibility." Eugene M. Singer, *Antitrust Economics and Legal Analysis* 49 (1981). As the Eighth Circuit concludes, " 'rigid adherence to a particular cost-based rule' ... can produce injustice...." *Henry v. Chloride, Inc.,* 809 F.2d 1334, 1346 (8th Cir.1987) (quoting *William Inglis & Sons,* 668 F.2d at 1035). One economist has concluded that "there can be predatory intent in price cutting whether or not the aggressor sets its prices above or below its costs...." Yamey at 134.

The preferable approach, therefore, is to apply a rule of reason and to look at the totality of the circumstances, considering evidence both of economics *and* of motive, and not to create any cost-based exclusionary rule. *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.,* 817 F.2d 639, 646 (10th Cir.1987); *Henry,* 809 F.2d at 1354 (Larson, J., concurring).[51] Various other courts allow proof of intent, but shift the burden of proof depending on the cost evidence. *William Inglis & Sons,* 668 F.2d at 1033–39; *Transamerica Computer Co., Inc. v. IBM Corp.,* 698 F.2d 1377, 1386–89 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983); *Henry,* 809 F.2d at 1346; *D.E. Rogers Assoc., Inc. v. Gardner–Denver Co.,* 718 F.2d 1431, 1437–38 (6th Cir.1983), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). Indeed, these approaches follow the traditional, or "conventional" rule, *see* Lawrence A. Sullivan, *Economics and More Humanistic Disciplines: What Are the Sources of Wisdom for Antitrust?,* 125 U.Pa.L.Rev. 1214, 1230–31 (1977); it is today's ruling that is the radical innovation.

A flexible rule of reason test would continue to allow analysis of cost and price and the existence of barriers to market entry, but would also consider the facts of the case: the nature of the market, including the number of competitors; the type of

---

**50.** *See, e.g.,* National Committee for the Review of Antitrust Laws, *Report to the President and the Attorney General* 150 (1979), cited in Gerla at 774 n. 99; Sullivan, *Antitrust* § 43, at 111; Dirlam at 813–14; *Sources of Wisdom* at 1232.

**51.** Although claiming to have "neither reject-ed[ed] nor embrace[d] the rule of reason ...," at 582, the court's prohibition of intent evidence represents a clear rejection of that Rule, which by definition does not categorically exclude an entire class of evidence.

goods or services in question; the condition of the predator including its age, the name recognition of its brands and the health of its production facilities; the number of different products produced by the parties; their relative market strength; market demand; and, of course, the conduct and intent of the parties. *See* Posner at 520; Martin J. Simkovic, Comment, *Judicial Tests to Determine Predatory Pricing before and after Matsushita*, 44 Miami L.Rev. 839, 841–42 (1990) (hereinafter *Judicial Tests*).[52]

That "predatory pricing is difficult to distinguish from vigorous price competition," at 587, should not negate such a flexible approach; indeed, this is the very reason we allow triers of fact to make a determination only after considering all of the evidence, why we employ juries rather than computers to reach decisions in even the hardest of cases.[53] Indeed, the only way to tell predatory pricing from healthy competition is by motive. *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 853 (5th Cir. 1981).

The removal of critical matters from the hands of the jury is one of the greatest injuries inflicted by the court today. If numbers add up to a trial judge's satisfaction, the case will end without the jury ever being allowed to see crucial evidence of guilt or innocence. In the present case, the court completely disregards a jury's conclusion that the Texas antitrust laws have been wilfully violated.

### V.

By rejecting a rule of reason for a *per se* mathematic analysis, the majority invites disastrous results. Monopolists will be free to price at will so long as they can justify their prices as greater than some "profit maximizing price," or are the slightest bit above "average variable cost." Taking advantage of their dominance over the market, and their resulting ability to produce at costs far lower than any new market participant, they can set prices at levels designed to destroy competitors. Having utilized this method to guarantee a monopoly in the relevant market, they can then recoup their losses with unimpeded price increases. Even with compelling and direct evidence of a predatory intent, there can be no liability. This result clearly undermines the effectiveness of the Texas Antitrust Act.

To escape liability in Texas a monopoly need only have an accountant maintain records which demonstrate pricing at least one penny above its self-determined average variable cost or short-term profit figure. The absence of intent evidence invites abuse of this process: "[i]f you really wanted to know what caused the unsavory flavor of the monopoly broth, you would not just audit the chef's books of account; you would also take a look at his recipe." *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1177 (7th Cir.1983) (Wood, J., concurring in part and dissenting in part), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Accountants have great leeway in deciding which costs are included as "variables," and the business can set for itself what its ideal profit figure might be.[54] The court's opinion is tantamount to an instruction to cook the books, for the accountant to massage the numbers in order to cover any malice, because any real evidence of intent will be ignored.

---

**52.** While reluctantly acknowledging the potential relevance of some of these factors to whether the seller has an "objectively reasonable expectation of recouping its losses," at 582, the court offers neither guidance as to their application nor explanation of why some factors, but not others, may be "objective."

**53.** The four Justices dissenting in *Matsushita* criticized the majority's economic-oriented approach as making "a number of assumptions that invade the factfinder's province," *Matsushita*, 475 U.S. at 599, 106 S.Ct. at 1362 (White, J., dissenting), and that take matters from the hands of a jury. *Id.* at 603–04 & n. 4, 106 S.Ct. at 1365 & n. 4. That admonition is equally applicable here: the court "is not required to engage in academic discussions about predation; it is required to decide whether respondent's evidence creates a genuine issue of material fact." *Id.* at 606, 106 S.Ct. at 1366. *Accord, Kelco Disposal*, 845 F.2d at 408.

**54.** One commentator notes that in relation to a pure cost test, the fact that "accounting records [are] in the hands of defendants" results in "inevitable slippage of the discovery process...." Pitofsky at 1066.

## VI.

This flawed test handcuffs district attorneys throughout Texas as well as the attorney general in public enforcement of the antitrust laws. By today's action criminal provisions of the Texas Free Enterprise and Antitrust Act, Tex.Bus. & Com.Code § 15.22, have been destroyed. A culpable mental state is a necessary element of a criminal offense, Tex.Penal Code § 6.02 (1974), and cannot be shown without intent evidence. This is particularly apparent in cases involving attempt to monopolize under subsection (b) of section 15.05, since "attempt" implies intent to take an illegal action. *See Robinson v. State,* 630 S.W.2d 394, 398 (Tex.Civ.App.—San Antonio 1982, writ ref'd). In an attempt to avoid responsibility for the permissiveness it encourages, the court refers to the constitutional limitation on its jurisdiction to "address the requirements of a criminal violation." At 588. How truly incredible! The underlying assumption, both unspoken and unsound, is that this first interpretation of the relevant statute will have no influence on public officials. What law enforcement authority would consider undertaking the already complex and difficult prosecution of a predatory violator, when the Supreme Court of Texas has insisted that an element critical to conviction must be written out of the law? Moreover, the same barriers that this opinion creates for private litigants will also serve to defeat civil enforcement by the Attorney General. Tex.Bus. & Com. Code § 15.20.

For any litigant somehow surviving the wreckage that remains in Texas antitrust law after this decision, the court has eliminated any ability to recover the treble damages mandated for "willful or flagrant" conduct. Tex.Bus. & Com.Code § 15.-21(a)(1). Acknowledging that something "above and beyond" mere proof of predation is required, the court conveniently declines to decide "what is appropriate...." At 588. The real reason for this failure to give even a hint is that there is no "appropriate proof". Without intent evidence, "willful" conduct, which obviously includes an element of motive, cannot be shown. The court has effectively repealed the treble damages remedy that the legislature determined to be so necessary to discourage anticompetitive practices.

While the immense damage inflicted today is concentrated in permissiveness toward predators, the court presents at least a theoretical problem for some who engage in justifiably substantial price cutting. The court's arbitrary rule of illegality for pricing below average variable cost denigrates any legitimate reason to price below that cost in the short run, such as promotions, shifts in demand, or economies of scale. *See* Sullivan, *Antitrust* § 43, at 111; Wesley J. Liebler, *Whither Predatory Pricing? From Areeda and Turner to Matsushita,* 61 Notre Dame L.Rev. 1052, 1073 (1986); Posner at 519. A test of the type adopted today, which is based on "short-term profit-maximizing price," has been rejected in perhaps the most extensive discussion of economics and antitrust law ever undertaken by a federal court exactly because: "A rule of predation based on the failure to maximize profits would rob consumers of the benefits of any price reductions by dominant firms facing new competition." *MCI Communications,* 708 F.2d at 1114.

An overly rigid test for predatory pricing could affect large cost-cutting retail chains intending only to make a profit by selling more for less. Moving into a new market, such a corporation may well price below its average variable cost as a means of entry. Though anticipating long-run profits from increased sales, the chain may lose money in the short-run. The court's test would find such a chain liable every time it attempted to expand. As one economist summarizes, "unless the courts were willing to explore the ... monopolist's behavior, it would lead to the condemnation of firms whose worst sin was to maintain a low-price, high-output ... strategy...." Scherer at 883.[55]

---

**55.** Similarly, a new market entrant may price below short run cost and absorb losses as a way of acquiring a share of an existing market. *See* Carstensen at 960. Nevertheless, this court would bar such competitive behavior.

## VII.

A test based on the rule of reason would preclude blind reliance on economic theory without exploration of the facts and circumstances of the parties involved. This court should have considered the facts of *this* case, including the unique nature of the newspaper industry markets. *See* S. Chester Oppenheim and Carrington Shields, *Newspapers and the Antitrust Laws* 1–15 (1981). The court conveniently ignores the practice of the Caller–Times in offering reductions solely to advertisers already doing business with Wheels and Keels; other advertisers received no discounts. *See* 791 S.W.2d at 166. As a valid indicator of predatory intent, *see* Sullivan, § 43, at 112, such targeted pricing reductions could be absorbed by a large newspaper without its having to price below average variable cost throughout its market.[56] Likewise, the court concludes without explanation that "Triad elected not to present any evidence on the price-cost relationship," at 580, when there was testimony both as to the profit margin and costs of the newspaper.[57] But, under the court's formulation, the facts have little or nothing to do with the legality of the conduct.

Disregarding the particular circumstances of this case is nowhere so apparent as with the court's conclusion that it is unnecessary to remand the antitrust issue, despite the fact that "this is a question of first impression" in Texas. At 578. Failure to remand in this instance is not excused by the court's claim that adoption of this test was "predictable." Triad had no way of knowing that this court would bar all intent evidence when most federal courts allow it. Because today's decision is the first clue in Texas that evidence of cost was required, and because Triad had no reason to believe that intent evidence

would be insufficient, there should at least be a remand of the antitrust issue in the interest of justice. Tex.R.App.P. 180.

## VIII.

Under the court's ruling, not only do consumers lose their protection under the Act, but small entrepreneurs, who have traditionally provided so much vital innovation, are endangered. Not surprisingly, in virtually all predatory pricing cases, the plaintiff is a business significantly smaller than the defendant. Joel B. Dirlam, *Marginal Cost Pricing Tests for Predation: Naive Welfare Economics and Public Policy,* 26 Antitrust Bull. 769, 774 (1981). When a purely economic test for antitrust violations is put into effect, the "likely result will be an economy ... dominated by a few corporate giants." Robert Pitofsky, *The Political Content of Antitrust,* 127 U.Pa.L.Rev. 1051, 1051 (1979). Contrary to the court's position, the Texas Free Enterprise and Antitrust Act has a dual "purpose ... to maintain and promote economic competition ... *and* to provide the benefits of that competition to consumers...." Tex.Bus. & Commerce Code § 15.04 (emphasis added).[58] Giving free rein to predators denies opportunities to both small businesses struggling to obtain a market share and to consumers who benefit from the choice and pricing that genuine long-term competition brings.

The words of an economist, John Maynard Keynes, are an apt explanation of today's otherwise incomprehensible decision:

> Practical men, who believe themselves to be quite exempt from any intellectual influences, are usually the slaves of some defunct economist. [Those] in authority, who hear voices in the air, are

---

**56.** Indeed, Areeda and Turner have conceded that their theories of efficiency work when applied to monopolies *unless* the monopolistic firm "can discriminate in price among different customers." 2 Phillip Areeda & Donald F. Turner, *Antitrust Law* § 403b, at 271 (1978).

**57.** The court entirely disregards statements of a Caller–Times employee relating to this subject. By not explaining how this evidence failed to

constitute a showing of cost and profit, this court not only establishes an unworkable test, it offers no guidance on what evidence beyond testimony on cost and price need be introduced to meet that test.

**58.** *See also* Baron at C–27; *The Texas Antitrust Act* at 1220; Jim Mattox, Attorney General, *Antitrust Enforcement in Texas: A Citizen's Guide* 1 (1983).

distilling their frenzy from some academic scribbler of a few years back.

John Maynard Keynes, *The General Theory of Employment Interest and Money* 383 (1935). By disregarding the purposes underlying the Texas Free Enterprise and Antitrust Act and returning to the injustice of *per se* rules, the court has undermined a statute designed to protect consumers and to encourage independent businesses. Abandoning the rule of reason, the court paints a new landscape of corporate giants with the broad brush of economic theory. This preference for hollow theory over law takes the slingshot from David's hand and puts it firmly into Goliath's.

MAUZY, J., joins in this dissent.

## DISSENT ON MOTION FOR REHEARING[1]

February 26, 1992

DOGGETT, Justice.

### I.

"We are going to run you out of ... business. Your days are numbered." [2] In prohibiting juries ever to hear such evidence, the court endeavors to put The Texas Free Enterprise and Antitrust Act out of business; the days of its meaningful en-

forcement are numbered. This important legislation was designed for enforcement through the actions of both private attorneys general and the Attorney General of Texas. On motion for rehearing, forcefully written pleas for reconsideration from both are rejected. Accordingly, I supplement my previous dissent.

Seven members of this court ignore the substance of Respondent's motion for rehearing.[3] Their action confirms their objective of undermining the Texas Free Enterprise and Antitrust Act, thereby strengthening monopolies at the expense of small businesses and consumers. As the Attorney General concludes, the court's endorsement of this one large newspaper "will make it difficult, if not impossible, to punish ... anticompetitive behavior by [any] monopolist." [4]

Most significantly, barring all intent evidence makes demonstrating a violation of the Act highly improbable. The court's test "establishes an inflexible, unworkable standard" which is "virtually impossible to meet." State of Texas Br. at 2, 6.[5] Because as an economic reality small businesses can rarely afford to set prices at a predatory level, it is monopolists, not small businesses, who benefit from the new rule. *Id.* at 5–6.[6] The court expresses only disinterest for the ease with which such mono-

---

1. The court has reluctantly withdrawn its original opinion in order to allow a remand of the antitrust issue, which it had originally denied. Because this belated change affects only the last paragraph of part VII of my dissent issued November 13, 1991, *see* 35 S.Ct.J. 114, 135 [p. —— *ante* ], I do not withdraw that opinion. *See infra* part II.

2. Statement by president of the alleged predator in *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1398 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990), to president of one of the prey. A jury finding of an antitrust violation in that case was overturned by a judgment notwithstanding the verdict which was then affirmed by the Seventh Circuit under a test barring intent evidence. *See infra* note 15.

3. Likewise, they fail to consider a directly relevant commentary written on the appropriate standard for predatory pricing, published after the court's opinion issued. *See* Jessica L. Goldstein, *Single Firm Predatory Pricing in Antitrust Law: The Rose Acre Recoupment Test and the Search for an Appropriate Judicial Standard*, 91 Colum.L.Rev. 1757 (1991) (hereinafter *Judicial*

*Standard* ). Rejecting a pure law and economics standard of the type adopted by this court, *id.* at 1769–82, this recent article supports a test strikingly similar to that adopted by the court of appeals and urged in my prior dissent. *Id.* at 1782–92.

4. The State of Texas' Brief as Amicus Curiae on Motion for Rehearing at 14 (hereinafter "State of Texas Br.").

5. It is also a test which is extremely expensive to meet—perhaps prohibitively so. As my prior dissent notes, the cost of experts battling over numbers and ill-defined economic and accounting terms will be enormous. "The spectre of such a battle, against an adversary with far superior resources, renders the antitrust laws *de facto* unavailable [to] those who need them most." Triad Communications, Inc.'s Motion for Rehearing at 15 (hereinafter "Triad Br.").

6. A test which focuses on the "reasonable expectation of recouping ... losses" and "barriers to market entry," op. at 582, "is vastly more favorable" to accused monopolists than to those seeking redress under antitrust laws, making "victory under the recoupment test unlikely." *Judicial Standard* at 1774.

polies can "crush out small men, all small capitalists, all small enterprises." [7]

The confusing nature of the test will, by itself, pose a continuing barrier to invoking the Act. While the court claims that its goal is certainty, op. at 582, "[t]he only certainty created by the Court's test is the certainty that businesses with monopoly power can engage in anticompetitive pricing practices in Texas without fear of liability for their wrongdoing." State of Texas Br. at 6. Additional uncertainty stems from the unanswered question of how evidence of intent can be introduced in order to meet the statutory treble damage requirement of showing willful or flagrant behavior by the wrongdoer. Tex.Bus. & Com.Code § 15.21(a)(1).[8]

Confusion will certainly make itself known in jury instructions.[9] For instance, the court appears to contemplate that a jury will be asked whether a business acted with rational economic motive, yet instructed that it is irrelevant whether the seller acted irrationally. Op. at 581 n. 6. ("The fact finder can determine whether there was an objective rational economic motive even if the seller acted irrationally."). The extreme difficulty in framing such questions in an intelligible fashion is designed to discourage those seeking vindication of their rights under the Texas Free Enterprise and Antitrust Act.

Another obstacle to justice erected by the majority's opinion is the increased difficulty of obtaining informed legal counsel. Despite the court's assertion of predictability, an attorney will be unable to advise a party claiming injury from predatory pricing concerning the validity of its potential claim. With the necessary cost data available only from the prospective defendant, counsel must follow a strategy of sue first, determine the legal merits later. What attorney will accept the unknowable case when the gamble of discovering later that the numbers do not justify a predatory pricing action risks exposure to being improperly sanctioned by an over-zealous judge for filing a purportedly frivolous suit? See Tex.R.Civ.P. 13. Discouraging legal representation is but another way the court accomplishes its objective of retarding implementation of our antitrust law.

For the many reasons stated above, "[t]his Court's decision will undoubtedly have a chilling effect on the willingness of small business to bring antitrust lawsuits against large monopolists and near monopolists, contrary to legislative intent and sound public policy." State of Texas Br. at 12. Triad, one small business which, now closed down, will never again initiate an antitrust action, asks "[d]oes the Court realize that its opinion will eliminate almost all private enforcement of the monopolization/attempted monopolization provisions of the Act ...?" Triad Br. at 3. The sad answer, evidenced by the court's lack of concern on the motion for rehearing, is apparently "sure, why not?"

Of the many dangers inherent in the court's decision, the Attorney General has particular expertise in addressing my concern that the opinion will thwart public law enforcement efforts. Op. at 589. The Attorney General warns that the court's decision:

> will clearly hamper enforcement by the Attorney General of predatory pricing and monopolization cases and, because

---

7. 21 Cong.Rec. 2598, 3147 (1890) (statement of Senator George on the goals of the Federal Sherman Act).

8. As the small business that sought relief here appropriately inquires:

> Will evidence of intent be admitted or not? If not, how can an antitrust plaintiff ever prove ... treble damages ...? Will the evidence come in under a limiting instruction? Does the Court really expect Texas trial judges to instruct their juries that "this evidence about intent that you will hear may be confusing to

> you, so you should disregard it in answering the basic liability issues, but you may consider it in deciding whether the defendant's conduct was 'willful or flagrant'?"

Triad Br. at 17.

9. While caused primarily by the court's refusal to draft a coherent test, this confusion also results from adoption of a standard over-reliant on economics. Such an approach is not as well "suited to the capabilities of judges and juries and the requirement of judicial administrability" as are flexible tests considering both cost and intent evidence. *Judicial Standard* at 1792.

the opinion calls into question Texas' commitment to antitrust law in general, may have an adverse effect on all antitrust enforcement.

State of Texas Br. at 13. The court's continuing disinterest in the ability to administer the Act underlies its disdain for the objectives of antitrust law.

Certainly there can no longer be any suit for *attempted* monopoly, for "attempt" cannot be found absent intent evidence.[10] As the State concluded, this "dangerous precedent ... tilts the state's antitrust laws in favor of monopolists and big business to the detriment of small businesses and consumers." State of Texas Br. at 2.[11] In the end, "[t]he real loser is the consumer, who does not reap the benefits of competition and is forced to pay monopoly prices." *Id.* at 6. In a case to which it is not a party, the State has rarely expressed such direct and intense disagreement with an opinion of this court. Like Robert Bork,[12] the court has taken up the banner of *no* antitrust laws, but unlike Bork, this court lacks the candor to admit the extreme nature of its position.[13]

## II.

My prior complaint that the court inexcusably refused to afford a new trial initially fell on deaf ears. Only after my dissent in *Carrollton–Farmer's Branch Indep.*

*Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489 (Tex.1992) (*Edgewood III*), pointed out the irreconcilability of the court's decision in these two cases did the court decide to confront this error. *See id.* at 537 (Doggett, J., dissenting). In *Edgewood III*, the majority announced that an issue of alleged first impression requires prospective rather than retroactive application. *Id.* at 515 (applying the ruling prospectively in order to refuse a refund of a tax held unconstitutional). Following this rule here, in another case admitted to be of first impression, would mandate a remand. Rather than following its own precedent from *Caller–Times* a few months later in *Edgewood III*, however, the court instead applied a new rule. Now *Caller–Times* is changed to conform with *Edgewood III*, and a remand is grudgingly allowed. This remand will be of no solace to Triad, which is left to relitigate under a convoluted and unworkable test.

In attempting to resolve one contradiction, however, the court exposes another. What in the original opinion was allegedly well-settled antitrust law has on rehearing been magically transformed, without any explanation, into unsettled law. At the same time, however, the court continues to ignore the sources cited by the dissent, adhering to its prior position that the law of predatory pricing is well-settled and only susceptible to one interpretation. In

---

**10.** *See* Triad Br. at 6 n. 5 ("[T]he Court effectively reads the 'attempted monopolization' provisions out of the Act entirely."). "Attempt" is defined in its common legal meaning as "an *intent* combined with an act." *Black's Law Dictionary* 127 (6th ed. 1990) (emphasis added). *See also Judicial Standards* at 1759, 1779 n. 150.

**11.** "By focusing only on conduct and removing evidence of intent, the Court's opinion largely protects monopolists or near monopolists which have the ability through anticompetitive behavior to destroy competitors, and, in so doing, destroy competition." State of Texas Br. at 5. *Accord Judicial Standard* at 1779–80 ("[I]gnoring all evidence of intent[,] no matter how compelling, is inconsistent with the accomplishment

of the goal of deterring anticompetitive behavior.").

**12.** *See generally* Robert H. Bork, *The Antitrust Paradox* (1978); and Robert H. Bork, *Contrasts in Antitrust Theory: I*, 65 Colum.L.Rev. 401 (1965). While the court feigned unfamiliarity with Bork, *see* op. at 582, he is commonly recognized as a leading spokesman for the type of negative approach to antitrust enforcement demonstrated here. *See, e.g., Judicial Standard* at 1763 n. 39, 1776 n. 136.

**13.** The court's Borkian approach, derived from the "Chicago School" of law and economics, "does *not* represent the majority view." *Judicial Standard* at 1776–77 n. 136 (emphasis added).

its compendium of selective citations, the court "look[ed] to federal law ... for guidance," and found such direction from the "[f]ederal courts [which] have addressed the question of predatory pricing on a number of occasions." Op. at 580. The law was so very clear that the court of appeals was found to have applied the "incorrect standard" for predatory pricing claims, *id.* at 588, implying the prior existence of one easily discernible and correct standard. This supposedly harmonious and lucid federal law is, of course, the basis for the court's conclusion that intent evidence is irrelevant to predatory pricing claims.

At the same time, however, the court repeatedly identifies this as a case of "first impression," *id.* at 578 & 580, admitting that the United States "Supreme Court has *not* developed a test for predatory pricing, *and the federal circuit courts take different approaches.*" *Id.* at 581 (emphasis added). The court is forced to "draw on the interpretations of several circuits," *id.* at 581, while explicitly rejecting that of the Ninth Circuit. *Id.* at 585. Thus, even though its entire opinion is based on the premise that federal law is settled and uncontroversial, the court must remand because that law is "sufficiently unsettled." *Id.* at 589.

In fact, the debate over predatory pricing and the role of intent evidence in the federal courts is a "controversy [which] still rages." *See* Jessica L. Goldstein, *Single Firm Predatory Pricing in Antitrust Law: The Rose Acre Recoupment Test and the Search for an Appropriate Judicial Standard,* 91 Colum.L.Rev. 1757, 1758 (1991) (hereinafter *Judicial Standard* ).[14] There is actually little direct authority for the court's complete bar of intent evidence.[15] At last, the court seems to confess on motion for rehearing that the manufacture of its contorted test relied only loosely on selective federal law. We will now have the most regressive interpretation of antitrust law in the country not because federal precedent compelled this outcome, but solely as a result of the court's social policy preference.[16]

### III.

There are additionally several matters in my prior dissent which are deserving of expansion and clarification. First, I concluded that the court's reliance on *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), was unjustified. This was in part because "the Supreme Court was concerned only with the context of summary judgment, which is not at issue in the current case." Op. at 597 n. 40. The Attorney General appropriately emphasizes this concern, concluding that the instant case:

**14.** The unpredictability of the federal law is exemplified by the citation of the same cases in support of opposing positions by both the Seventh Circuit, which increasingly advocates a cost-based "recoupment" test, and the Eleventh Circuit, which prefers an intent-based rule. *See Judicial Standard* at 1770 n. 93.

**15.** The court cited five federal circuit courts for the proposition that "[t]he subjective intent of a seller should not be a factor in determining whether its prices are predatory." Op. at 587. The dissent concluded that "[o]nly two federal courts have ever barred all intent evidence." *Id.* at 596 n. 37. Apparently, even that was too generous an interpretation of federal law: the Attorney General has clarified that all but *one* of the federal courts cited "anticipate the receipt of subjective intent evidence." State of Texas Br. at 7 n. 4. *See A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,* 881 F.2d 1396 (7th Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). The State is correct that

even the court in *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 236 (1st Cir.1983), considered the lack of evidence of whether a firm "wished" to exclude a potential competitor. *See also Judicial Standard* at 1764 n. 42 (*Barry Wright* did not hold that presumptions of legality based on pricing are "*absolutely* conclusive."). In addition to those circuits which I previously noted as allowing introduction of intent evidence, a ninth has adopted perhaps the most intent-oriented approach yet. *U.S. Philips Corp. v. Windmere Corp.,* 861 F.2d 695, 704 (Fed.Cir. 1988), *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2070, 104 L.Ed.2d 635 (1989) (an antitrust violation may be established for a dominant, price-cutting company motivated by eliminating a competitor even if it is pricing above costs); *see Judicial Standard* at 1765–66.

**16.** The unfortunate result today is that there remains "only [one] show in town" for Corpus Christi consumers seeking to place a classified advertisement. Triad Br. at 13.

was filed in a Texas court under the Texas Antitrust Act. The [majority] nonetheless relied on *Matsushita*, a federal case construing federal procedural law. By so doing, the Court inappropriately engrafted federal procedural law onto the Texas Act.... The Act does not ... authorize adoption of federal procedural rules....

State of Texas Br. at 7. As this court has recently written, the role of summary judgment is quite different in the federal system than in Texas, where it is fortunately disfavored. *Casso v. Brand,* 776 S.W.2d 551, 555–56 (Tex.1989). Thus, not only did the court apply a summary judgment standard to a case not involving summary judgment, *it applied a summary judgment standard not a part of Texas law.*[17]

Second, my previous characterization of the Texas Free Enterprise and Antitrust Act as turning towards a rule of reason, does not represent a disavowance of all *per se* rules, but rather a rejection of *per se legality* of the type established by the court's test. There remain a number of acts which are *per se illegal. See Red Wing Shoe Co. v. Shearer's, Inc.,* 769 S.W.2d 339, 341–42 (Tex.App.—Houston [1st Dist.] 1989, no writ) (noting turn towards a federal rule of reason but continued existence of *per se* illegality). Indeed, the Texas Antitrust Act explicitly mentions "price fixing, or other *per se* violations." Tex.Bus. & Com.Code § 15.05(i) (emphasis

added). The purpose of retaining some *per se* rules of illegality is to ease the burden of proof in certain types of cases, "thus encouraging those who have been wronged to bring suit and aiding in antitrust enforcement." State of Texas Br. at 5 n. 3. Today's action returns us to the abandoned approach of *per se* legality,[18] since any monopolist who appropriately cooks the books cannot be found liable under the court's test, regardless of a clearly evidenced intent to break the law. Once again, the result is to discourage the victim of anticompetitive conduct from seeking redress.

Finally, much of my prior disagreement centered on the court's economic model, or lack thereof. Now the Attorney General of Texas and yet another legal scholar urge that "antitrust was not meant to be solely an economic discipline, and predatory pricing is not solely an economic problem." *Judicial Standard* at 1779. To the extent that the field of economics is relevant, the court's theory remains deeply flawed. Predatory pricing is both an economic reality and a serious problem, *id.* at 1775–76, unresolved by the type of test announced here because that approach is "not economically sound in terms of either its specific application or its theoretical economic underpinnings." *Id.* at 1770.[19] A "broad and flexible" test applying a rule of reason and considering many factors, including both cost and intent evidence, is the preferable approach. *Id.* at 1789–91.

**17.** As I have previously emphasized, *Matsushita* in no way mandates a cost-based test. *See Judicial Standard* at 1770–71 (distinguishing *Matsushita* as concerning "unique" facts and involving a conspiracy rather than monopoly or attempted monopoly claim, and concluding that the United States Supreme Court "gave no indication that it was limiting [its former] emphasis on intent.").

**18.** This is precisely how Professors Areeda and Turner, on whom the court relies, describe their approach: "A price at or above reasonably anticipated average variable cost should be *conclusively presumed lawful.*" Phillip Areeda & Don-

ald F. Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 733 (1975) (emphasis added).

**19.** Among the technical deficiencies in the reasoning underlying the court's test noted by my dissent and confirmed by the most recent commentary are: the presence of irrational but strategically valid reasons to price predatorily with no expectation of recouping losses, such as deterring new market entries, *Judicial Standard* at 1775 & n. 128; the difficulty of determining average variable cost, which is not even the best cost measure of predation, *id.* at 1782, 1784; and the absence of a clear standard for "entry barrier." *Id.* at 1781.

## IV.

Unfortunately during the Reagan/Bush administrations, "all branches of [the federal] government have become more lenient toward antitrust violations." Steven W. Heller, *Heads I Win, Tails You Lose: A Study of Antitrust Jurisprudence in the Federal Circuit,* 1 Fordham Ent.Media & Intell.Prop.L.F. 231 (1991). Now Texas is forced to join in this parade of permissiveness. Despite the best efforts of the Legislature, the Attorney General, the court of appeals, and a Corpus Christi judge and jury, this court is determined to convert a monopoly prevention act into a monopoly protection act. The impact of today's opinion will be felt far into the future—monopolies have been strengthened, small businesses threatened, and in the end, the consumers pay for it all.

MAUZY, J., joins in this opinion.